**CAROUSEL'S CREAMERY,
L.L.C., Appellant,**

v.

**MARBLE SLAB CREAMERY,
INC., Appellee.**

**No. 01–02–00690–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 15, 2004.

Rehearing Overruled May 6, 2004.

---

1. George Allen, Judge of the 54th District Court of McLennan County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h) (Vernon Supp.2004).

Charles Thomas Schmidt, Schmidt & Hoffer, L.L.P., Houston, TX, for Appellant.

Robert B. Gilbreath, Jenkens & Gilchrist, Dallas, TX, Christopher M. Brown, Jenkens & Gilchrist, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, HIGLEY, and ADELE HEDGES.*

## OPINION

ADELE HEDGES, Justice.

Appellant, Carousel's Creamery, L.L.C. (Carousel) appeals a judgment in favor of Appellee, Marble Slab Creamery, Inc. (Marble Slab). We affirm in part and reverse and remand in part.

## Background

In the mid-nineties, intending to increase the size of its franchise system, Marble Slab distributed to potential franchisees a Uniform Franchise Operating Circular (UFOC), which contained representations of its two company-owned stores: one on Westheimer Road and one on Montrose Boulevard. In 1997, Carousel began investing in Marble Slab franchises, and, over time, operated several Marble Slab franchise stores, until financial losses forced them to close.

Carousel contends that the UFOCs it obtained from Marble Slab misrepresented the value of the franchise, upon which it relied to its detriment. For example, it contends that because the Westheimer store was far more lucrative than the Montrose store, Marble Slab decided to sell the Montrose store in order to "dramatically improve the financial results that could be portrayed in the UFOC with the Westheimer store being used as the model

* The Honorable Adele Hedges, who became Chief Justice of the Fourteenth Court of Appeals on December 8, 2003, continues to participate by assignment for the disposition of this case, which was submitted on November 10, 2003.

store for marketing franchises." After the Montrose store was sold, Marble Slab's UFOC reflected the financial performance of only the Westheimer store, whose profits were atypical. Carousel also contends that the UFOC mischaracterized the Westheimer store's earnings because it did not disclose that (1) the Westheimer store did not have labor costs, as corporate employees and franchisee-trainees operated the store, and (2) the Westheimer store catered corporate events, which generated more profits than in-store sales, and that the catering events were also free of labor costs, as they, too, were performed by corporate employees.[1] According to Carousel, the Westheimer store's financial data showing an approximate net income return of thirty percent artificially inflated profits.[2]

Carousel sued Marble Slab, asserting causes of action for violations of the DTPA, negligent misrepresentation, and fraud,[3] and Marble Slab counterclaimed for breach of contract. The case was tried to a jury. The trial court granted Marble Slab's motion for directed verdict with respect to the negligent misrepresentation claim, but denied the motion on the fraud and DTPA claims. The jury found against Carousel on its fraud and DTPA claims. It also found that Carousel breached its contract with Marble Slab and awarded damages to Marble Slab in the amount of $55,810.18.

In eight points of error, Carousel contends that the trial court erred as follows: by granting Marble Slab's motion for directed verdict on its negligent misrepresentation claim (point 1); by excluding certain evidence (points 2–4); by failing to include accountants and attorneys in the definition of Marble Slab's agents in the jury charge (point 8); and that the jury's answers to questions one (fraud), three (DTPA), and seven (Carousel's breach of contract was not excused) were so against the great weight and preponderance of the evidence that the verdict was clearly wrong and unjust (points 5–7).

Marble Slab brings three conditional cross-points, which it asserts in the event that we sustain Carousel's points two, three, four, five, six, or eight. Because we overrule Carousel's points two, three, four, five, six, and eight, we do not address Marble Slab's cross-points.

## I. Negligent Misrepresentation

In its first point of error, Carousel contends that the trial court erred when it sustained Marble Slab's motion for directed verdict on the negligent misrepresentation claim. In response, Marble Slab contends that the court's ruling was correct, because Carousel failed to establish it suffered an injury independent of the contract and/or because the parole evidence rule, the merger/integration doctrine, and the disclaimer clause in the franchise agree-

---

**1.** Carousel contends that this misrepresentation translated into a ten to fifteen percent increase in the Westheimer store's profit margins for true labor charges and fifteen to eighteen percent increase in the Westheimer store's profit margins from catering corporate events.

**2.** Carousel contends that Marble Slab made numerous "false and/or misleading representations, omissions, contradictions, and unsubstantiated [sic] claims" including that

Marble Slab failed to disclose that franchises in cities other than Houston would incur additional freight charges on supplies, that Marble Slab owned a store in Fort Worth, which was operating at a loss, and that the Westheimer store was not required to pay a royalty, as was required by other Marble Slab franchises.

**3.** Carousel alleged numerous other causes of action which are not at issue on this appeal.

ment bar Carousel's negligent misrepresentation claim.

## A. Standard of Review

We follow the usual standard of review in examining the propriety of a directed verdict. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000).

### 1. Evidence Supporting Carousel's Claim

█ The elements of a cause of action for negligent misrepresentation are as follows: (1) a representation is made by the defendant in the course of his business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the defendant's misrepresentation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991).

The record contains some evidence that Marble Slab made a false representation in the course of its business, or in a transaction in which it had a pecuniary interest. Prior to 1996, Marble Slab did not provide prospective investors with financial information on any company-owned stores. This practice changed, however, in 1996 when, for the first time, Marble Slab's UFOC included a "positive earnings claim" which consisted of financial representations to prospective investors regarding its company-owned store. Carousel's investors reviewed Marble Slab's UFOCs, which described the Westheimer store. Dan Collins, one of Carousel's investors, testified that the UFOC he reviewed was misleading and inaccurate because it failed to disclose that catering revenue was part of the total food sales of the Westheimer store, understated labor costs, understated freight charges, and did not identify franchisees that left the Marble Slab system. Carousel also presented evidence that Marble Slab failed to exercise reasonable care or competence in obtaining or communicating the information detailed in the UFOC. Marble Slab admitted that it did not generate contemporaneous documents in the form of time cards or other documentation when corporate employees provided labor at the Westheimer store, and that, although the Westheimer store paid employees who provided labor at that store, Marble Slab did not specifically disclose that corporate employees periodically provided labor and services at the Westheimer store. Although Marble Slab was in possession of data that would allow it to calculate the percentage of transfers or the percentage of franchisees that leave the Marble Slab system, it did not calculate the overall turnover rate for the entire system. Collins testified that Carousel purchased a Marble Slab franchise in 1999, and that Marble Slab provided Carousel with its 1997 UFOC, whereas it should have provided him with the 1998 UFOC. The 1998 UFOC differed from the 1997 UFOC in that the turnover rate reflected in the 1998 UFOC was over twice the turnover rate reflected in the 1997 UFOC.

There is evidence that Carousel justifiably relied on Marble Slab's representations. Collins testified that the cover page of the UFOC indicated that the Federal Trade Commission had set rules and regulations requiring that the information contained in the UFOC be truthful, accurate, and concise, and therefore expected that the UFOC would in fact be accurate and not presented in a misleading fashion. Item 19 of Marble Slab's UFOC states:

> Except for the information included in this offering circular, you acknowledge

that you have not relied in any manner on any warranties, representations and/or guarantees regarding the profitability or other results of operation of a particular franchise or on any proposed franchise, and no such warranty, representation or guarantee has been or will be made by Marble Slab.

Furthermore, Marble Slab's Ronald J. Hankamer, Sr. testified that, if information is included in Marble Slab's UFOC, a prospective franchisee may rely on it.

The record also contains evidence that Carousel suffered pecuniary losses by relying on Marble Slab's UFOCs. Marble Slab circulated a memo to all of its existing franchisees regarding freight charges and minimum order charges for franchises located outside of the delivery area of its distributor. The freight bills for these franchises amounted to approximately ten to twenty percent of their purchase price. This information was never provided to Carousel. Collins testified that this information would have influenced Carousel's decision to invest in Marble Slab, because it directly affected Carousel's bottom line. He opined that if Marble Slab's UFOC had contained a full disclosure, Carousel would not have purchased Marble Slab franchises.

Collins also testified that Carousel paid $225,000 for its location in Lafayette, Louisiana. At the time of the purchase, he testified that the value Carousel actually received was $20,000 if only the assets were to be considered in arriving at the location's value, and between $100,000 and $125,000 if the location were to remain within the Marble Slab system. When Carousel sold the Lafayette store, it received $112,500. When Carousel purchased the Lafayette location, it believed that it was purchasing a "viable business plan for an ice-cream store." Collins testified that what Carousel actually received, however, was "a business that needed a high volume of corporate catering, free labor, and the luxury of not having to pay freight charges," and, without this subsidization, the business could not be profitable. Carousel's total operating losses from the years 1998 to the date of trial amounted to $308,189. Collins testified that if Carousel had never joined the Marble Slab system, it would not have suffered the operating losses detailed above.

### a. Independent Injury

Relying on *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998), Marble Slab contends that the directed verdict was proper because Carousel did not show that it suffered an injury independent of the franchise agreement. In *D.S.A.*, the supreme court held that, in order to proceed on a claim for negligent misrepresentation, the party must establish that it sustained an injury independent of its contract claim. *Id.* at 663.

We note that Carousel abandoned its claim for breach of contract against Marble Slab. Carousel does not complain that Marble Slab breached the franchise agreement, but rather that Marble Slab misrepresented what it was selling to Carousel. Therefore, Carousel has no obligation to show an injury independent of a hypothetical contract claim, since for the purposes of this discussion, it has only one claim: negligent misrepresentation. Texas jurisprudence has long recognized the co-existence of obligations and duties separately imposed by contract and tort. *MCN Energy Enterprises, Inc. v. Omagro de Colombia*, 98 S.W.3d 766, 772 (Tex. App.-Fort Worth 2003, pet. denied); *see also Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). These cases were not altered by *D.S.A.:* that court expressly stated that it was not deciding whether a party breached a legal duty

independent of its duties imposed by contract. *D.S.A.*, 973 S.W.2d at 663.

■ In fact, we believe that the concept of independent injury is not really the issue in this case. The more logical analysis is whether Carousel has brought a claim sounding in tort when the duty breached arises out of a contract. Generally, a party may not assert a claim based upon tort when the only duty at issue arises from a contract. *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 559–60 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). We hold that Marble Slab had a tort duty not to make negligent misrepresentations to Carousel, and that Carousel has urged a legitimate tort—negligent misrepresentation—and not a breach of contract claim disguised as a tort.

#### b. The Disclaimer Clause

■ Relying primarily on *Schlumberger Tech. Corp. v. Swanson*, Marble Slab contends that the franchise agreement's disclaimer clause provides an alternative basis for overruling Carousel's first point of error. We disagree. The disclaimer clause Marble Slab relies upon provides as follows:

7.1 FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED FROM THE COMPANY (OR ANYONE ACTING OR PURPORTING TO ACT ON BEHALF OF THE COMPANY) ANY ORAL OR WRITTEN INFORMATION CONCERNING THE POTENTIAL SALES, COSTS, INCOME OR PROFITS THAT MAY BE DERIVED OR POTENTIALLY DERIVED FROM FRANCHISEE'S STORE. FRANCHISEE ACKNOWLEDGES AND AGREES THAT THE ACTUAL RESULTS OF FRANCHISEE'S STORE MAY VARY FROM OTHER MARBLE SLAB CREAMERY LOCATIONS. THE COMPANY EXPRESSLY DISCLAIMS ANY WARRANTY, REPRESENTATION OR GUARANTEE REGARDING THE ECONOMIC SUCCESS, IF ANY, OF FRANCHISEE'S STORE. FRANCHISEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY SUCH FRANCHISE AND THE ECONOMIC RESULTS THEREOF ARE ENTIRELY SPECULATIVE IN NATURE. FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RELIED IN ANY MANNER ON ANY WARRANTIES, REPRESENTATIONS AND/OR GUARANTEES REGARDING THE PROFITABILITY OR OTHER RESULTS OF OPERATION OF FRANCHISEE'S STORE, NO SUCH WARRANTIES, REPRESENTATIONS OR GUARANTEES HAVING BEEN MADE BY THE COMPANY OR ANY ONE [sic] ON BEHALF OF THE COMPANY.

In *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex.1997), the supreme court held "that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181. The court emphasized that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim, and concluded only that on the record before the court in that particular instance, the disclaimer of reliance conclusively negated as a matter of law the element of reliance. *Id.*

In determining whether the disclaimer in this case is binding, *Schlumberger* requires that we look at the contract and the circumstances surrounding its formation. *Schlumberger*, 959 S.W.2d at 179. In *Schlumberger*, the very purpose of the parties' agreement was to resolve an existing dispute and to terminate their busi-

ness relationship. *Id.* at 180. The parties negotiated at arms-length and, during negotiations, were represented by "highly competent and able legal counsel." *Id.* Additionally, both parties were "knowledgeable and sophisticated business players." *Id.*

In this case, the parties did not enter into the agreement containing the disclaimer to resolve an ongoing dispute. There was, in fact, no existing dispute at the formation stage of the agreement. Unlike the *Schlumberger* agreement, which contemplated the termination of a business relationship, the agreement entered into in the instant case contemplated creating a business relationship. Considering that no dispute existed between the parties during the formation of the agreement creating the parties' business relationship, when compared to *Schlumberger*, the disclaimer clause in this case is not an important part of the basis of the bargain. Furthermore, Carousel did not retain counsel to negotiate with Marble Slab, and Marble Slab has not directed us to evidence in the record suggesting that the parties negotiated at arms-length in arriving at the final terms of the agreement. Finally, considering that the supreme court decided *Schlumberger* on its specific facts, we note that the level of sophistication exhibited by Carousel does not rise to that of the Swansons in *Schlumberger*.[4]

#### i. Representation Inconsistent with Contract Language

Marble Slab relies on *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135 (Tex. App.-Houston [1st Dist.] 1995, writ denied), for the proposition that a misrepresentation claim will fail when based upon purported misrepresentations inconsistent with the specific language of a written contract. In *Fisher Controls*, this Court stated that "[w]hen experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in an earlier statement." *See id.* at 141–42 (because the terms of the contract charged plaintiff as a matter of law with the facts he contended were misrepresented, he was unable to rely on any inconsistent oral representations preceding the written contract).

◼ We distinguished *Fisher Controls* from *Wagner v. Morris*, 658 S.W.2d 230 (Tex.App.-Houston [1st Dist.] 1983, no writ). In *Wagner*, the plaintiffs were not charged as a matter of law with knowledge of the facts which they contended were misrepresented. *Id.*, (citing *Wagner*, 658 S.W.2d at 234 (Evans, C.J., concurring)). We find this case to be analogous to *Wagner*. The contract does not charge Carousel, as a matter of law, with knowledge of the true facts of the matter that it contends were misrepresented. *See Fisher Controls*, 911 S.W.2d at 142. Carousel does not complain about misrepresentations that contradict the terms of the contract, but instead, of misrepresentations concerning the financial results of Marble Slab's company-owned store.

---

4. Marble Slab contends that Carousel had "ready access" to the services of an attorney in the franchise transactions, that the UFOC urged Carousel to retain counsel, and that Collins and other Carousel principals were sophisticated business persons. We are, however, required to examine the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Bus. Sys. v. Custom Controls*, 761 S.W.2d 302, 303–04 (Tex.1988). There is no dispute that Carousel was not represented by counsel in the franchise transactions and the record contains evidence suggesting that Collins and other Carousel principals were not sophisticated business persons.

## c. The Merger / Integration Clause

Marble Slab also contends that the merger/integration clause contained within the franchise agreement is an alternative basis for overruling Carousel's first point of error. The merger/integration clause provides as follows:

> 8.4 This Agreement contains the entire agreement between the parties, no representations, inducements, promises, or agreements, oral or otherwise between the parties with reference thereto and not embodied herein shall be of any force or effect.

■ In *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957), the supreme court considered whether parol evidence was admissible, despite a merger clause in a written contract, to establish that a contract was induced by fraud. The court held that "a merger clause can be avoided based on fraud in the inducement and ·that the parol evidence rule does not bar proof of such fraud." *See id.* at 239. Likewise, in an unpublished opinion, this Court has held that an integration clause in an agreement did not preclude liability for a negligent misrepresentation claim because the integration clause contemplated only contractual obligations, and not tort liability. *See Desert Palm Properties, N.V. v. McFarlane*, No. 92–00967–CV, (Tex.App.-Houston [1st Dist.] June 14, 1996, writ denied) (not designated for publication). Carousel presented evidence that Marble Slab misrepresented numerous facts, including its labor and freight costs for its company-owned store, and those misrepresentations induced Carousel to enter into its agreement with Marble Slab. We hold that Marble Slab has not defeated Carousel's negligent misrepresentation claim as a matter of law by its defensive issues. The trial court erred in directing a verdict on Carousel's negligent misrepresentation claim.

We sustain Carousel's first point of error.

## II. Point of Error Numbers Two and Three

In its second point of error, Carousel contends that the trial court erred when it excluded evidence in the form of deposition transcripts of other franchisees' complaints to rebut Marble Slab's argument that it has a "big happy franchise family."

### A. Waiver

■ Carousel waived its second point of error because its contention on appeal that Marble Slab opened the door to this testimony was never argued before the trial court. At trial, Carousel offered the evidence "for the purpose of presenting evidence on reliance, intent, and materiality." A party may not assert on appeal a basis for admission of evidence not presented to the trial court. *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 151 (Tex.App.-Corpus Christi 1996, no writ).

We overrule Carousel's second point of error.

## III. Intent, Materiality, and/or Reliance of Excluded Testimony

In its third point of error, Carousel contends that the excluded testimony was relevant to show the issues of intent, materiality, and reliance. Marble Slab contends (1) that Carousel's offer of proof failed to preserve error; (2) that Carousel waived point three because it cited no authority in its appellate brief supporting its contention that the excluded testimony was relevant to show the issues of intent, materiality, and reliance; (3) that Carousel placed the matter in issue, thereby inviting error; (4) relying on *State v. Buckner Constr. Co.*, 704 S.W.2d 837, 848 (Tex.App.-Houston

[14th Dist.] 1985, writ ref'd n.r.e.), that *res inter alios acta* evidence is inadmissible, because it is irrelevant, immaterial, and highly prejudicial; and (5) that Carousel failed to establish that the error, if any, was harmful.

## A. Standard of Review

■■■ We review the exclusion of evidence under an abuse of discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). For the exclusion of evidence to constitute reversible error, the complaining party must demonstrate that (i) the trial court erred by excluding the proffered evidence, and (ii) the error probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a)(1). A successful challenge to the trial court's evidentiary rulings usually requires that the complaining party demonstrate that the judgment turned on the particular evidence excluded. *Alvarado,* 897 S.W.2d at 753–54. In making that determination, we review the entire record. *Id.* at 754.

Carousel complains about the exclusion of the testimony of Gerald Calegan, another Marble Slab franchisee, who would have testified that he also relied on the representations in the UFOC, and used it to decide whether a Marble Slab franchise would be a good investment. Calegan would not have invested had he known that the UFOC was incomplete or that fifteen to eighteen percent of the company-owned Marble Slab store's revenue came from catering operations. Carousel contends that this testimony was "not just relevant, but crucial, for Appellant to convince the jury of MSC's intent to defraud franchisees, the materiality of MSC's lies, and the justifiable reliance on the false statements."

■■■ The general rule, known as the doctrine of *"res inter alios acta,"* is that

transactions of a party to a lawsuit with persons not parties to the same suit are inadmissible, because they are irrelevant, immaterial and highly prejudicial. *State v. Buckner Constr. Co.,* 704 S.W.2d 837, 841 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.). An exception to this rule permits the admission of prior acts or transactions with other persons to show a party's intent, where material, if those individuals are so connected with the transaction at issue that they may all be parts of a system, scheme, or plan. *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 815 (Tex.App.-Corpus Christi 1988, no writ).

Carousel contends that the excluded evidence prevented it from presenting corroborating evidence, and argues that the reason why the verdict turned on the exclusion of this evidence was "because the only potential source of corroborating evidence was from other franchisees who fell victim to Marble Slab's scheme." Carousel's argument is essentially that the exclusion of and therefore absence of corroborating evidence was calculated to cause, and probably did cause the rendition of an improper verdict. Assuming that the trial court abused its discretion in excluding this evidence, we must decide whether the error was harmful.

■■■ The trial court, however, admitted other corroborating evidence which supported Carousel's contentions at trial. Collins testified that prior to filing suit against Marble Slab, he received communications from other franchisees that "... raised [his] suspicions that perhaps there may be a problem systemic to the entire system." One such communication was a letter authored by the president of the Marble Slab Franchisee Association. The following exchange occurred regarding the letter:

[Carousel's Counsel]: Now, during this period of time, you were receiving communications from other parties or other franchisees that raised a suspicion on your part that there may be a problem with the basic business model of Marble Slab Creamery?

[Collins]: I received some information.

\* \* \*

[Carousel's Counsel]: When was the first time you had ever heard of the Marble Slab Franchisee association?

[Collins]: With a copy of this letter.

[Carousel's Counsel]: When you received the letter, was there any information in the letter that raised your suspicions that perhaps there may be a problem systemic to the entire system?

[Collins]: Yes, as a matter of fact, there was a sentence within the document, in fact the whole document but one sentence particularly that—

[Carousel's Counsel]: Please read the sentence that raised your suspicion about the possibility of systemic problems in the system.

[Collins]: It says you may have thought you were the only one having difficulty but you are not alone.

[Carousel's Counsel]: Now did you hear yesterday in opening statement that Mr. Brown suggested that all of the franchisees were happy?

[Collins]: I did.

[Carousel's Counsel]: Is that consistent with what we see in this document that was sent by Mr. Schulman?

[Collins]: No, it's not.

Collins further testified that after Carousel filed suit against Marble Slab, he investigated the letter's assertions regarding the difficulties experienced by other Marble Slab franchisees. Collins spoke with several dozen franchisees as part of his investigation, and, following his investigation, Carousel amended its lawsuit against Marble Slab. Collins further testified that Carousel received numerous documents through discovery, which confirmed his suspicions.

The trial court also admitted evidence Carousel offered regarding turnover rates. Collins testified that he conducted an analysis, which revealed that the turnover rates in the Marble Slab system almost doubled between 1997 and 2000. During the rebuttal portion of its closing argument, Carousel's counsel argued as follows regarding Marble Slab franchise turnover rates:

> Happy franchisees. I have heard that throughout. Again, oh, what a tangled web we weave. If you look and you heard the evidence, turnover rates of nearly 30 percent. 30 percent of the franchisees are either transferring, terminating or leaving the system. 30 percent. That is remarkable. Does that sound like a bunch of happy franchisees? Absolutely not.

We hold that Carousel has not demonstrated that the exclusion of the proffered evidence probably caused the rendition of an improper judgment. Considering all the evidence admitted and excluded, the jury was presented with and was able to consider the entire sequence of events, including evidence that Carousel was not the only franchisee experiencing difficulties. Carousel made the jury aware that it received communications from numerous franchisees substantiating its suspicion "that perhaps there may be a problem systemic to the entire system," and Collins read excerpts from one such communication to the jury. Although Calegan's deposition testimony would have further corroborated Carousel's argument and evidence, Carousel has not demon-

strated that the absence of Calegan's testimony probably caused the rendition of an improper judgment.

We overrule Carousel's third point of error.

### IV. Improper Argument

In its fourth point of error, Carousel contends that the trial court erred in allowing Marble Slab to comment on the fact that Carousel hired expert witnesses, but did not call them to testify.

 The party complaining of improper jury argument has the burden to prove that (1) the argument was improper, (2) the improper argument was not invited or provoked, (3) error was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, (4) the improper argument was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge, and (5) the argument by its nature, degree and extent constituted reversible error. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979). We conclude that Carousel invited Marble Slab's comments.

During Carousel's closing argument, Carousel's attorney stated:

[W]e did not bring you any experts. The people we brought to you were the people who were involved with the transactions. The actual people. They were not professional witnesses, they were not paid to give testimony. They are just honest, good folks. I also called the people from their side because I knew that like I said in a court of law you can pull the lawyers away and expose the truth and we did that. We did not bring you any experts.

What did they do? They went and hired themselves an expert to—$250 an hour, Allen Westheimer to come in and trash Carousel's Creamery and they hired Michael Seid, $350 an hour to somehow excuse what they did. None of them, none of them, none of them ever looked at the accounting documents at Marble Slab, not one of them. If they really wanted you to know the truth, wouldn't they have spent some of that money confirming what it is that they're trying to tell you? There is a reason they didn't do that.

In reply, Marble Slab argued:

They got all the documents, they have every shred of paper Marble Slab has generated in the last five years. And believe me, I fought them every step of the way to give it to them because I didn't think it mattered. But they got every piece and they looked at it and they hired people to look at it and they postulated about what was going to happen and then they put on their case. . . .

\* \* \*

And Burt Simon, their forensic accountant that they paid to go through Carousel's documents who, of course, didn't testify in this case told Allen Westheimer you can't rely on any of this stuff because I did a bunch of guessing trying to figure it out. He said I had to guess because it [sic] just wasn't anything there.

\* \* \*

You heard testimony that Mr. Westheimer spent 60 thousand dollars on this case and Mr. Seid spent 30. I would love for you to give me 90. And add it to the number and make it 145,810.80. If you don't think they are worth that, if you don't think that time is well spent, then you are welcome to do whatever you think is right with those numbers. But don't sit there and let him accuse me of hiring a gun to come here and tell

you something. Because you know what? They had every opportunity to do it themselves. They actually looked to experts to assist them with analyzing their data and you didn't hear from them either.

\* \* \*

They had every piece of paper that we generated about catering, about corporate labor, about everything. They have spent two years fulltime [sic] creating this lawsuit. If there was an exert who would raise his right hand and tell the truth and say they were reasonable in relying on Schedule B, I submit to you that you would have seen them. He doesn't exist. There is no amount of money that could get anybody to sit in that chair and say it is reasonable to rely on Schedule B. To [sic] the extent that they did at the exclusion of all other evidence.

We hold that Carousel's jury argument invited the comments made by Marble Slab, and overrule Carousel's fourth point of error.

## V. Factual Sufficiency

In its fifth and sixth points of error, Carousel contends that the jury's answers to question numbers one (fraud) and three (DTPA) were so against the great weight and preponderance of the evidence that they were clearly wrong and unjust.

### A. Standard of Review

We review factual sufficiency of the evidence under the usual standard of review. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### 1. Fraud

To prevail on its fraud claim, Carousel was required to prove all of the following: (1) a material representation was made, (2) the representation was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the representation was made with the intention that it be acted upon by the other party, (5) the party acted in reliance upon the representation, and (6) the party suffered injury. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998). Carousel was required to establish that its reliance was both actual and justifiable. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001).

### 2. DTPA

To prevail on its DTPA claim, Carousel was required to prove all of the following: (1) Carousel was a consumer of Marble Slab's goods or services; (2) Marble Slab committed one of the false, misleading, or deceptive acts enumerated under Section 17.46(b) of the DTPA, breached an express or implied warranty, or engaged in an unconscionable action or course of action; and (3) these acts were the producing cause of Carousel's actual damages. *Brown v. Bank of Galveston, Nat. Ass'n*, 963 S.W.2d 511, 513 (Tex. 1998). Producing cause requires that the acts be both a cause-in-fact and a "substantial factor" in causing the injuries. *Id.* at 514. Stated differently, it is an "efficient, exciting, or contributing cause, which in the natural sequence of events, produces injuries or damages." *Id.*

### a. Evidence of Causation

Marble Slab argues that the jury findings are not against the great weight and preponderance of the evidence because the evidence is factually insufficient to support causation as to Carousel's fraud and DTPA causes of action. Allen Westheimer, a certified public accountant

and certified fraud examiner, testified on behalf of Marble Slab. Westheimer testified that he examined the circumstances surrounding Carousel's investment. He focused specifically on Carousel's investigation of the investment, and its management actions subsequent to its purchase. He testified that the Carousel investors "made so many mistakes and errors of business judgment and missed so many red flag warnings that came to their attention that they only have themselves to blame for the troubles that they had." He arrived at this opinion after reviewing pleadings, income tax returns, accounting documents, financial statements, profit and loss statements, depositions, minutes of the meetings held by Carousel Creamery, several Marble Slab UFOCs, the due diligence documents that the Carousel investors gathered in connection with their purchase of their Marble Slab stores, correspondence, sales reports, paid out reports, personal financial information, financial statements and tax returns of the five Carousel investors, demographic information, and numerous other documents.

Westheimer testified that the Carousel investors did almost no investigation at all before purchasing the Seigen Lane store. The Carousel investors only reviewed accounting records, paid bills, bank statements, and only the profit and loss statement dated October 31, 1997, which covered only the first six and one-half months that the store was open, before investing. They did not hire an attorney to assist them in connection with the due diligence investigation, and it appeared to Westheimer that the Carousel investors did not consult a CPA prior to investing. The Carousel investors did not perform a market demand study, or feasibility study and had no written plan for the proposed venture. Westheimer testified that the due diligence that the Car-

ousel investors performed was "negligent" and that "they seemed to have the opinion that it was unnecessary to do that because they had been told that this store had been badly managed and that all they really needed to do ... was to come in and provide good management...." Westheimer testified that Carousel's reliance on the UFOC was unreasonable, and that the UFOC contains caveats that a reasonable investor should heed when conducting due diligence. Wendy Little managed the Seigen Lane store. Westheimer testified that she failed to adequately control the staffing levels at Carousel's creamery, and that she failed to track labor costs with forms provided by Marble Slab. He also testified that her attempts or ability to control the cash of the store were "pathetic" and that "red flags" were present suggesting that she was stealing money.

For example, the Seigen Lane store was paying for purchases directly from the cash register, as opposed to depositing all cash receipts into a bank account. In calender year 1999, the store paid out over sixty thousand dollars directly from the cash register. The cash pay-outs continued, contrary to instructions to refrain from this practice. In 2000, the store had $36,000 in cash pay-outs from the cash register. Ms. Little allowed payables to fall delinquent, and failed to report this to the other Carousel investors. She began withdrawing money from other stores in order to pay the bills.

Westheimer also testified regarding Carousel's Citiplace store. He described the accounting practices prior to Carousel's purchase of the Citiplace store as "abominable." When Carousel purchased the store, there was a large deficit in the payroll tax account. Westheimer testified that his review of the Citiplace store's financial statements and documents raised

an "enormous red flag" and that "anybody receiving these financials with the idea of buying this business and seeing this threadbare balance sheet and the negative payroll taxes would have been warned that they needed to investigate this further to find out what's going on."

Westheimer testified that Carousel received a sales packet regarding the Lafayette store that Carousel purchased, which included a profit and loss statement. Westheimer explained to the jury that profit and loss are measured over a period of time, typically one year, and that the profit and loss statement from the Lafayette store was not dated. There was no balance sheet included in the sales packet. Westheimer testified that Carousel eventually obtained a balance sheet for the Lafayette store, but that it, too, contained a "big red flag." Specifically, the profit and loss statement showed an $88,000 profit, but the area on the balance sheet detailing cumulative profit and losses showed that the business had, from the date it opened, lost between $38,000 and $39,000, and had not made $88,000. Westheimer testified that the results of his investigation did not indicate that Carousel did anything to investigate this discrepancy.

In addition to testifying about individual stores in which Carousel had invested, Westheimer also testified regarding Carousel's general accounting and financial procedures. Westheimer testified that Ms. Little was creating Quick Books reports, but that she was creating them for each individual store, and did not create a consolidated report for the entire Carousel organization. This prevented Carousel's investors from getting a picture of the entirety of the organizations profits or losses except for once per year, and that Carousel's investors should have been given up-to-date ongoing consolidated financial reports every month. When asked

whether Carousel stood a better chance of turning its business around had the accounting problems been brought to the attention of the investors, Westheimer testified that because these accounting practices were never brought to the attention of the investors, the problems simply worsened. Westheimer testified that in his opinion, there were no credible financial records, and that Carousel's records were "totally unreliable." He added that Carousel's records are not to be reasonably relied upon to present fairly what their losses may have been, or to describe what their financial position may have been in any point in time, and stated "you should not rely on any of these in coming to any conclusions about what their damages might be."

Mr. Collins, one of the Carousel investors, acknowledged on cross-examination that although he gave his fellow investors his "business judgment" that the Seigen Lane store was a good investment, he did not review the store's payroll tax and FTCA information, the store's bank statements, its freight costs, its insurance information, its daily and weekly sales data, its workers compensation costs, and its financial statements before investing. Furthermore, Collins did not speak with any Marble Slab employees prior to advising his business partners that Seigen Lane was a good investment, and did not contact other Marble Slab franchisees before investing. Collins testified that his business retained a attorney who was licensed in Texas, but that the attorney did not review the franchise agreement. Collins, was asked at least six times whether he read the franchise agreement for the Citiplace store before signing and investing forty thousand dollars in it, but never gave a direct answer. The trial court even instructed Collins that he was to answer the question, beginning with either "yes" or "no" and informed him that he could then elaborate

if elaboration was required to make his answer true and correct, but Collins continued to evade answering the question.

Franchising expert Michael Seid, who reviewed pleadings, depositions, the UFOC, and the Marble Slab franchise agreement testified that it was silly, foolish, and improper for Carousel to rely on the UFOC detailing Marble Slab's Westheimer store. He testified that there is a historic correlation between the efforts put into the investigation process and the ultimate degree of success one enjoys as a franchisee. Seid testified that he saw no evidence that the Carousel investors, as a whole, conducted an independent investigation of the franchise offering. He testified that three of the Carousel investors were "fairly sophisticated" individuals, who "should have known better." After reviewing the depositions given by the Carousel investors, Seid stated:

> ... nowhere in the record I read ... does anybody admit to reading the UFOC. The best I can get to is somebody scanned it. The banker looks at some papers that are disemboweled from the document, just ripped out of a document and that's what he's making his evaluation on without anything else about the document. They don't do what we suggest about calling the existing franchisees to find out if a franchisor is a miserable person or if they are getting the services. They don't engage an accountant to review the box and records of the businesses they're buying. They don't hire an attorney. They don't prepare a business plan. They don't do anything.
>
> They buy a franchise—they buy a business. They don't buy franchisee [sic], they buy a business that sales ice cream without a clue. And you sit and you read the depositions as you did and you really feel sad. Because they just

didn't do anything. And that's what the deposition said. So none of the things we recommend was [sic] done.

Dan Collins testified as follows: His company invested almost one million dollars in Marble Slab. Collins testified that Marble Slab failed to fully disclose in the UFOCs the quantity and quality of catering performed by the Westheimer store, that the Westheimer store's labor costs were understated, and that Carousel would be responsible for undisclosed freight charges. Collins testified that if Marble Slab had fully disclosed this information, Carousel would have never purchased any Marble Slab stores, and would not have bought rights to any Marble Slab stores. Carousel's total operating losses from the years 1998 to the date of trial amounted to $308,189. Collins testified that because Carousel would have never joined the Marble Slab system, it would not have suffered any of the operating losses detailed above. He testified that Carousel thought it was purchasing a "viable business plan for an ice cream store" but actually received "a business that needed a high volume of corporate catering, free labor, and the luxury of not having to pay freight charges ... to make it a profitable business." Because Carousel could not duplicate the quality and quantity of catering and did not have the luxury of free labor at its locations, Carousel did not actually purchase Marble Slab stores that could make a profit in the locations in which they were located. Because of this, Carousel essentially paid a premium price for assets.

We conclude that the evidence is not so weak nor is the finding so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. Specifically, we find that there is sufficient evidence to support the finding that Marble Slab's representations were neither a cause-in-fact nor a "substantial

factor" in causing Carousel's injuries. Carousel is, therefore, unable to recover on its DTPA and fraud claims. Carousel presented evidence inconsistent with the jury's finding, but the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex.1982). The trier of fact may resolve conflicts and inconsistencies in the testimony of any one witness as well as the conflicting testimony of different witnesses. *Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex.1972). This Court cannot substitute its judgment or its opinion for that of the jury. *Lofton v. Tex. Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

We overrule Carousel's fifth and sixth points of error.

## VI. Carousel's Justification for Failure to Comply with the Franchise Agreement

In its seventh point of error, Carousel contends that the jury's answer to question number seven was (1) against the great weight and preponderance of the evidence and (2) incorrect as a matter of law. Question 7 asked as follows:

Was Carousel's failure to comply excused?

Failure to comply by Carousel's is excused if all of the following circumstances occurred:

1. Marble Slab
 a. by words or conduct made a false representation or concealed material facts,
 b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and
 c. with the intention that Carousel's would rely on the false represen-

tation or concealment in acting or deciding not to act; and

2. Carousel's
 a. did not know and had no means of knowing the real facts and
 b. relied to its detriment on the false representation or concealment of material facts.

Answer "Yes" or "No"

Answer_____

The jury replied "No."

Marble Slab contends that Carousel waived its great weight and preponderance challenge to the answer to question seven by failing to assign it as a point in its motion for new trial; it further argues that because Carousel did not file a motion for judgment n.o.v. in the trial court, it failed to preserve the right to assert a "matter of law challenge." Indeed, Carousel failed to assign the jury's answer to question seven as a point in its motion for new trial, and failed to brief its complaint on appeal as a matter of law challenge. Moreover, Carousel's brief does not demonstrate that (1) no evidence supports the jury's determination that Carousel was justified in failing to comply with the franchise agreement, or that (2) the evidence conclusively establishes that Carousel was justified in failing to comply with the franchise agreement. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

Carousel has, however, clarified its complaint in its reply brief. Its seventh point of error does not concern the jury's findings based upon the evidence presented at trial, but, instead, complains that a finding in Carousel's favor on its negligent misrepresentation claim would have conclusively negated its liability to Marble Slab on the contract. We liberally construe points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants. *Holley v. Watts,*

629 S.W.2d 694, 696 (Tex.1982). Accordingly, we interpret and analyze Carousel's complaint as urged in its reply brief.

■ Carousel was entitled to have its negligent misrepresentation claim submitted to the jury. If the jury had determined that Marble Slab negligently misrepresented facts to Carousel, that misrepresentation would have allowed Carousel to avoid its contractual obligations with Marble Slab. *Russell v. Industrial Transp. Co.*, 113 Tex. 441, 258 S.W. 462, 462 (1924); *Citizens Standard Life Ins. Co. v. Muncy*, 518 S.W.2d 391, 395 (Tex.Civ.App.-Amarillo 1974, no writ).

We sustain Carousel's seventh point of error.

### VII. Refusal to Define Agents in the Charge

In its eighth point of error, Carousel contends that the trial court erred in refusing to include lawyers and accountants in the definition in its charge to the jury defining Marble Slab's agents. Marble Slab contends that Carousel failed to preserve error because Carousel's proposed instruction is not contained in the appellate record, and because Carousel's objection "... did not clearly designate the error and explain the grounds for the complaint." *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex.1986).

■ Rule 274 of the Texas Rules of Civil Procedure provides as follows:

> A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.

TEX.R. CIV. P. 274. An objection does not meet requirements of Rule 274 unless the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the conclusion that trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it. *Chrysler Corp. v. Roberson*, 619 S.W.2d 451, 459 (Tex.Civ. App.-Waco 1981, no writ). Carousel's objection to the definition of Marble Slab was a follows:

> [The Court]: ... Any objections to the court's charge from the plaintiff?
>
> [Carousel's Counsel]: Yes, Your Honor. No. 1, plaintiff objects to the definition of Marble Slab as it appears on page 3 because it does not include attorneys and accountants which we believe is appropriate to properly instruct the jury given the evidence in this case and I am tendering to the court our requested instruction No. 1 which includes those terms and would ask the court to refuse or sign it as refused so we can file it.
>
> [The Court]: Okay.

We are able to distill three reasons from Carousel's brief why it contends the trial court should have defined agents to include accountants and attorneys: (1) "so that the jury would clearly understand that MSC's agents included its accountants and attorneys." (2) "MSC also made it clear to the jury that its law firm drafted the UFOC.... As a result, the jury could have been confused and decided that if the law firm was at fault, MSC was not liable." (3) failing to define agents to include attorneys and accountants "very likely misled the jury to conclude that MSC's reliance on them was an excuse for its tortious conduct."

■ Carousel waived any error because it failed to clearly designate the alleged error and specifically explain the

basis of its complaint in its objection to the charge. TEX.R. CIV. P. 274; *Castleberry*, 721 S.W.2d at 276. Carousel's objection to the definition of Marble Slab because it did not include attorneys and accountants, "which [Carousel believed was] appropriate to properly instruct the jury given the evidence in this case ..." was not specific enough to support the conclusion that the trial court was fully cognizant of the ground of Carousel's complaint, and deliberately chose to overrule it. Furthermore, the requested instruction is not included in the appellate record, and we cannot consider matters outside of the appellate record. *Exocet Inc. v. Cordes*, 815 S.W.2d 350, 355–56 (Tex.App.-Austin 1991, no writ) (construing former Rule of Appellate Procedure 50).

We overrule Carousel's eighth point of error.

### Conclusion

We reverse and remand the portions of the trial court's judgment regarding negligent misrepresentation and whether Carousel's failure to comply with the franchise agreement was excused for proceedings consistent with this Court's opinion. We affirm the judgment in all other respects.