**Opinion issued June 22, 2023**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-22-00278-CV

———————————

## IN RE COMMITMENT OF LONNIE CLEMONT ENCALADE

---

### On Appeal from the 209th District Court
### Harris County, Texas
### Trial Court Case No. 0749423Z

---

## MEMORANDUM OPINION

In this civil commitment proceeding, the State petitioned to have appellant

Lonnie Clemont Encalade declared a sexually violent predator under Texas Civil

Commitment of Sexual Violent Predators Act (the SVP Act). *See* TEX. HEALTH &

SAFETY CODE § 841.001–.153. After a jury found beyond a reasonable doubt that

Encalade was a sexually violent predator, the trial court signed a final judgment and entered an order of civil commitment.

In five issues, Encalade argues: (1) Texas's civil commitment statutes do not comply with due process, (2) the trial court erred in excluding evidence under Texas Rule of Evidence 705, (3) the trial court abused its discretion by prohibiting Encalade's expert from testifying, (4) the evidence is legally insufficient to support a finding beyond a reasonable doubt that Encalade is a sexually violent predator, and (5) the evidence is factually insufficient to support a finding beyond a reasonable doubt that Encalade is a sexually violent predator.

We affirm.

## Background

In October 1977, Encalade was convicted of rape of a child and sentenced to five years imprisonment. In August 1997, Encalade was convicted of sexual assault of a child and sentenced to 25 years imprisonment. Encalade's sentence discharge date was April 5, 2022.

In July 2020, in advance of Encalade's discharge date, and noting that Encalade was pending entry into the Texas Department of Criminal Justice (TDCJ) Sex Offender Treatment Program, which could result in his release on parole prior to his sentence discharge date, the State petitioned to have Encalade declared a sexually violent predator under the SVP Act. The State alleged that Encalade was a

repeat sexually violent offender and that he suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence.

A few months after filing its petition, the State moved for a judicial admonishment and for an order directing Encalade to participate in an expert evaluation, as required by Section 841.061(c) of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE § 841.061(c) ("The person and the state are each entitled to an immediate clinical interview of the person by an expert."). In its motion, the State contended that an expert evaluation of Encalade on behalf of the State was scheduled on December 28, 2020, via telehealth video conference at Encalade's TDCJ unit, but Encalade refused to participate. His evaluation was rescheduled for January 20, 2021. The State requested that the trial court schedule a hearing, compel Encalade's attendance at the hearing, and admonish Encalade of the consequences of his refusal to participate in an expert examination on behalf of the State. The trial court signed a written order on January 19, 2021, ordering Encalade to participate in an expert evaluation by Dr. Darrel Turner, the State's designated expert, the following day, January 20, and to comply with "all discovery requests allowed under the law." Encalade refused to participate in the January 20 evaluation by Dr. Turner.

On February 8, Encalade's counsel moved to withdraw as counsel, citing an "insurmountable but voluntary (on [Encalade's] part) cutoff in attorney-client

3

communications." According to counsel's motion to withdraw, Encalade had "declined to accept telephone calls or written correspondence" from his counsel since December 1, 2020 and directed staff at his TDCJ unit to tell his counsel "he's fired." The trial court denied the motion to withdraw. Additional counsel made an appearance on behalf of Encalade, but counsel continued to have communication issues with Encalade.[1] Accordingly, the parties agreed to postpone Encalade's deposition to July 19. On July 12, Encalade indicated his refusal to appear at the July 19 deposition, and the State canceled his deposition noticed for that date.[2]

On July 29, the State moved to strike Encalade's original answer and proceed on a judgment nihil dicit.[3] The State argued that Encalade has "repeatedly indicated by words and actions that he will not participate in expert evaluations or civil discovery," and therefore, the State requested that the trial court strike Encalade's answer, enter a judgment nihil dicit, and:

---

[1] Encalade's counsel stated in a June 24 email to the State that Encalade was not communicating with her "at all," and indicated that more time was needed to schedule his deposition and that it was possible intervention from the trial court would be necessary.

[2] The State had previously noticed Encalade's deposition for March 26, 2021, but canceled that deposition.

[3] A judgment nihil dicit "is an abandonment of every known defense or any defense which ordinary diligence could have disclosed." *Sharif v. Par Tech, Inc.*, 135 S.W.3d 869, 872 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

- Instruct the jury that it could use Encalade's refusal to participate in expert examinations as evidence against him;

- Prohibit Encalade from presenting any evidence at trial, including evidence from his retained expert Dr. Marissa Mauro;

- Prohibit Encalade from cross-examining the State's experts because doing so would allow Encalade to raise a defense.

The State noticed Encalade's deposition for August 16, but Encalade refused to participate.[4] Thereafter, the State filed a motion to compel discovery responses and Encalade's appearance at a deposition, citing the above as evidence of Encalade's refusal to participate in the discovery process. The State also amended its motion to strike.

On October 22, 2021, the trial court granted the State's motion to compel and ordered Encalade "to participate in the discovery process, to include submitting himself for a deposition and responding to discovery requests made by the [State]." The trial court further warned Encalade that the failure "to answer a question at deposition as directed by this Court . . . may be considered a contempt of Court."

---

[4] There is some discrepancy in the record as to whether Encalade was aware that he was being summoned to a deposition on August 24, as opposed to a court hearing. At the deposition, an officer from Encalade's TDCJ unit stated that she had informed Encalade that he had "a Zoom meeting . . . a court hearing . . . and he needed to go." But that he "refused multiple times." Encalade's counsel confirmed with the officer that she "summoned [Encalade] to a court hearing and not a deposition." However, Encalade's counsel also stated for the record that he received the notice of the deposition on August 16, forwarded it to Encalade on August 18, and under the mailbox rule, it was presumed that Encalade received the deposition notice on August 23.

On February 1, 2022, the State noticed Encalade's deposition for February 15. Encalade again failed to appear.

After Encalade failed to appear at his scheduled February deposition, the State filed its second amended motion to strike his original answer and proceed on a judgment nihil dicit. In it, the State argued that under Section 841.061 of the Texas Health and Safety Code, Encalade was required to submit to all expert examinations and that, if he fails to do so, that statute authorizes statutory sanctions. The State also alleged that Encalade violated Texas Rule of Civil Procedure 199 by refusing to sit for a deposition. Accordingly, the State sought sanctions under Section 841.016 and Rule 215.2 of the Texas Rules of Civil Procedure.

In his response, Encalade argued that the death penalty sanctions sought by the State were not supported by the record because the State could not show that Encalade had engaged in the kind of egregious and blatant disregard for the discovery process to justify the imposition of death penalty sanctions. Encalade also argued that imposing these sanctions would be improper as there had not been any previous intervention by the trial court. He also argued that Section 841.061(f) sanctions were not appropriate because they prevent a person from gaining an advantage by refusing to submit to a clinical interview or examination by the State's expert, but fully participating in one performed by his own expert. Here, Encalade had refused to be interviewed by any expert—the State's or his own—and thus had

6

no advantage over the State. Finally, Encalade argued that the sanctions authorized by Rule 215.2, including disallowing him to support or oppose designated claims or offenses, or prohibiting the introduction of evidence, conflict with Chapter 841.

On February 24, the trial court entered an order for trial sanctions. In the order, the trial court noted that Encalade had "been given multiple opportunities, yet has steadfastly refused to submit to expert examinations and to participate in discovery as ordered by this court." Accordingly, the trial court imposed the following sanctions:

> A jury instruction will be given that states [Encalade's] refusal to submit to expert examinations may be used as evidence that [Encalade] has a behavioral abnormality that predisposes him to commit a predatory act of sexual violence. [Encalade] is prohibited from offering evidence [of] the results of an expert examination performed on [his] behalf at trial.

The case proceeded to trial on February 25 and the jury heard from two witnesses: Dr. Turner and, briefly, Encalade.

## A. Dr. Turner

At trial, Dr. Turner, a clinical psychologist who specializes in forensic psychology, testified as an expert for the State. He began by discussing his qualifications to handle civil-commitment cases, including his doctoral education on the subject, his published research, his treatment of sex offenders, and his experience in performing between 360-400 behavioral-abnormality evaluations since 2013. Dr. Turner testified he employs a clinically adjusted actuarial approach when performing

7

these evaluations. He explained that first he reviews records related to the offender's history to prepare for an in-person evaluation. He then scores some psychological instruments that help him make his ultimate decision and sometimes writes a report and provides his ultimate opinion.

In this case, Dr. Turner explained that he began his evaluation of Encalade by reviewing numerous records received from the TDCJ, as well as the Special Prosecution Unit, which included "[r]ecords related to [his] offenses, court documents, police investigation documents, records that relate to how he's gotten along in prison, what his behavior has been like in prison, any interviews he might have done for parole or with other psychologies, medical records, things of that nature related to his criminal history, and then also social history." He testified that the records he reviewed here are the same type of records typically reviewed and relied upon by experts in his field. Dr. Turner testified that, typically, when he conducts a behavioral abnormality evaluation, he meets with the offender. He explained that the rules of ethics applicable to forensic psychologists require the psychologist to, "if at all possible, interview the person that you are evaluating and coming to some kind of conclusion about."

Here, however, he testified that he tried to meet with Encalade on several occasions, including once before he was hired by the State. Dr. Turner testified that although Encalade was required to participate in the evaluations, Encalade refused

8

to meet with him. Dr. Turner further explained that when an offender refuses to meet with him, he considers "[e]verything that is in the records . . . [in] an effort to see if [he] can answer any of the questions that [he] would've asked [the offender] related to his offenses – how he thinks about them now, et cetera – from the records." As a result, Dr. Turner based his assessment on the historical records he received related to Encalade. Even though Encalade refused to meet with him, Dr. Turner testified that his evaluation was conducted in accordance with his training as a psychologist and in accordance with the acceptable standards within the field of forensic psychology, and that he was still able to make an opinion in this case to a reasonable degree of clinical certainty. He explained that, in the past, he had conducted an evaluation where the person refused to meet with him, which resulted in him not having enough information to offer an opinion. But that was not the case here.

### 1. Sexual Offending History

Dr. Turner testified that Encalade has been convicted of and served two prison sentences for sexual offenses. The first was a 1977 conviction for rape of a child. This offense occurred when Encalade was 17 years old. According to the records Dr. Turner reviewed, Encalade approached a 14-year-old girl, a stranger, at a park, took her against her will from Houston to Galveston, threatened her with a gun, made comments that he was going to "blow her head off", and raped her multiple times. Encalade made various statements related to this offense in the records reviewed by

Dr. Turner, including claiming that he and the victim knew each other, that she went willingly with him, denying that he used a weapon, making threats, or forcing her in any way. Encalade also claimed she was a prostitute, which was contradicted by the medical assessment provided by the victim's mother, which indicated this was the first time the victim had had sex and that it was uncharacteristic of the victim to stay out late and not come home. Dr. Turner testified that Encalade had never taken responsibility for this offense.

Dr. Turner testified that, from this offense, he considered there to be several risk factors. First, the victim was 14, which is "quite different from someone that's 17 and 16." Additionally, the "fact that a weapon was brandished and used; the fact that she was taken against her will; the fact that she was raped multiple times – she was actually raped on three occasions that night[;] . . . the fact that the offender has reported that he was intoxicated on marijuana and alcohol at the time; the fact that he has degraded the victim – calling her a prostitute, blaming her . . . those are all risk factors that, according to research . . . increases risk of reoffending." The fact that the victim was also a stranger is a risk factor.

Encalade's second sexual assault offense occurred in 1995 against Encalade's daughter. His daughter reported that Encalade began sexual molesting her when she was 12 and that the abuse continued for four years until she was 16. He would come into her room where she was sleeping and fondle her genitals. She reported that

Encalade would be naked sometimes, other times he would just have his penis exposed and would masturbate while he touched her. Eventually, Encalade did penetrate her sexually. Encalade's daughter also reported that he punched her on several occasions when she began making noises to alert her mother during the abuse. At the time he was sexually offending against his daughter, Encalade was on probation for the offense of possession of marijuana.

Dr. Turner testified that, from this offense, there were additional risk factors he considered. First, the victim was his daughter, who is a related victim. Dr. Turner explained that there are three main victim categories to consider in risk assessment: strangers, related victims, and acquaintances. The first victim was a stranger, "[s]o now he has another type of victim. We know that he's willing to offend against strangers; we know that he's willing to offend inside his family[.]" Dr. Turner further expanded on the additional risk factors:

> We know that he's willing to offend while there are other people in the home, which is a level of brazenness that is going to speak to his degree of antisociality. He admitted to being intoxicated at the time of this offense, as well, which we also know to be a risk factor. And just in general terms, having been punished for a sexual offense previously and then committing another sexual offense is called "persistence after punishment"; and especially in behavioral abnormality evaluation, it is a very important risk factor.

Dr. Turner explained that reoffending after punishment is an important risk factor to consider because "[i]t gets to the guts of this law and this evaluation, which speaks

11

to volitional control because of sexual deviant urges. We have seen this in his past now, and that is rare among sex offenders. . . . Most sex offenders have one offense."

On cross-examination, Dr. Turner admitted that incest offenders have a lower rate of reoffending.

### 2.     Sexual Deviancy

Dr. Turner testified that when evaluating someone for a behavioral abnormality, he looks for aspects and factors in their life that can make a sexual offender more likely to reoffend. According to research, the two biggest factors for reoffending are evidence of sexual deviance and antisociality. Dr. Turner testified that sexual deviance "refers to a sexual interest or act that victimizes, or would require victimizing, someone else in order to fulfill." He explained that sexual deviance is relevant to determining whether someone has a behavioral abnormality because that looks at whether "there [is] something going on with this individual that makes them likely to reoffend . . . [s]o we look at what we know are risk factors that research has shown will increase their likelihood of reoffending, and one of the big two is sexual deviance." Dr. Turner testified that a behavioral abnormality is a condition "that makes this sex offender have serious difficulty controlling their behaviors, controlling their emotions that arise because of sexual deviance, and they're likely to act on it because they are antisocial enough to not be anchored down by remorse or empathy, things of that nature."

Dr. Turner testified that he found Encalade was sexually deviant. He recognized that Encalade's case was "somewhat different than most of the behavioral abnormality cases" in that "in a lot of cases, if there are all adult victims and it's a serial rapist, we may see evidence of sadism" or "[i]f the victims are all . . . children, and we would look at pedophilia as a sexual deviance." Dr. Turner explained that the victims here were 14 and 12, so Encalade did not fit the definition of pedophilia or specifically having an attraction to violence involved in sadism, but he still believed Encalade to be sexually deviant because he "is so antisocial that he takes sex when he wants it, when the opportunity presents itself, with no []regard for the victim in any capacity." Dr. Turner testified that Encalade was "someone who has offended, been punished, reoffended in a sexual nature with minors, and done that because he feels entitled and because he isn't bogged down by empathy." He explained that the law does not require that someone have a "DSM diagnosis such as pedophilic disorder or sexual sadism" to be found to be sexually deviant. He further testified that sexual deviance does not go away, as sexual interests are chronic and lifelong.

### 3. Antisocial

Dr. Turner testified that he initially diagnosed Encalade with antisocial personality disorder, with a provisional qualification, meaning at the time he made the diagnosis he did not feel he had enough information about his childhood

13

behaviors to make a full personality disorder diagnosis. He explained that for someone to have a full diagnosis of antisocial personality disorder, he needs to have a conduct disorder as a child. Upon further review of the information contained in the records about Encalade's childhood conduct, Dr. Turner testified that at that point he was comfortable making a full diagnosis of antisocial personality disorder.

Dr. Turner testified that an antisocial personality is someone who, because of conditions and characteristics in their personality, such as feeling like they are "entitled, having problems with authority, not caring about the rights or the well-being of other people, pathological lying, having no empathy for pain in other people," tends to engage in criminal behavior. He testified that there were multiple places in the record that indicated Encalade started acting out and using drugs as early as 10, including evidence that he was stopped by police for shoplifting when he was 10 years old. Encalade also stated that he dropped out of high school to sell drugs to help his family. On cross-examination, Dr. Turner admitted that he could not pinpoint to a page of the record where he found this evidence but agreed it could have been from the MHMR report where the evaluator found him to be malingering with respect to a competency evaluation. Dr. Turner confirmed that the drug use at 10 would have been a self-report, because Encalade was not arrested at that time.

Dr. Turner considered Encalade's overall criminal history, discussed in more detail below, as evidence of his antisocial personality disorder. He explained that

many individuals with antisocial personality disorder are impulsive and do not plan or consider the consequences of their actions. This is evidenced by the repeated criminal behavior seen in Encalade's criminal history.

Additionally, Dr. Turner testified that there was evidence that Encalade was manipulative. He explained that people with antisocial personality disorder are good at reading people and determining weaknesses, and often, you will see people with antisocial personality disorder who are manipulative and conning in nature, in order to get what they want. Encalade's records indicate that he had a previous diagnosis of schizophrenic disorder, but Dr. Turner testified that he believed that was something Encalade malingered, or essentially, faked when he was in trouble when he was in his mid-30s. One of Encalade's evaluators indicated that he was likely malingering, and Dr. Turner confirmed that it would be unlikely, or rare, for someone to be diagnosed with schizophrenia into their 30s. Dr. Turner explained that in the prison system, people usually malinger mental illnesses to get cells to themselves, lighter work, or other "secondary gains" as a result of the mental illness. Dr. Turner testified that either if Encalade was accurately diagnosed with schizophrenia or he was malingering, this would be a risk factor.

### 4. Actuarial Instruments

As part of his assessment, Dr. Turner testified that he used an actuarial instrument called the Static-99R, which looks at ten factors to estimate how likely a

sex offender is, after release, to be arrested or convicted for another sexual offense. Dr. Turner testified that the Static-99R does not make predictions as to whether someone will reoffend, but that it provides some initial data, "a superficial look at the offender," after which the evaluator should "dig and look at the rest of the factors that we have to consider based on research." The name "static" indicates that the variables considered are historical and will not change.

Dr. Turner testified that although he initially scored Encalade as a four, he ultimately scored Encalade as a two on the Static-99R. Dr. Turner explained that Encalade was charged with kidnapping in connection with his first sex offense, but that charge was later dismissed. Dr. Turner initially counted the kidnapping charge as a second conviction, when it should have been only counted as one. He explained, however, that although this changed the normative group Encalade was in, it did not change his overall opinion related to Encalade's risk for reoffending. Dr. Turner testified that the overall risk of reoffending is not based on the instrument score alone. "The Static-99 is most appropriately used and relied on if you've got a gigantic group of sex offenders that you're trying to kind of quickly categorize. But if you're looking at one person, there are so many risk factors and protected factors and other things that aren't considered by the Static-99 that best practices indicates need to assess for whether they look at all factors considered, not just those on this

one instrument." Thus, there are additional research-based factors that "absolutely have to" be considered.

### 5. Other Risk Factors

Dr. Turner testified that Encalade has been incarcerated at least five separate times for non-sexual offenses. These were primarily drug offenses, but Encalade also had one conviction for theft. He was convicted of possession of marijuana in 1990 and sentenced to twenty years' imprisonment. He was also convicted of delivery of a controlled substance in 1982 and was sentenced to seven years' imprisonment. Both convictions occurred between the two sexual assault offenses. Encalade was also arrested and charged with assault relating to hitting his girlfriend during a domestic disturbance.

In addition to his criminal history, Dr. Turner testified that Encalade had been "in trouble quite a bit" since being incarcerated. Dr. Turner testified that Encalade had received "many" disciplinary infractions, 61 in total, some major, including for indicating to the administration that he planned to escape. Some infractions were also for violent behavior, including two for fighting with other inmates. Dr. Turner stated that Encalade's refusal to cooperate, including to sit for his deposition and his failure to follow rules resulting in these infractions, was something Dr. Turner considered in his evaluation. Some of these disciplinaries occurred after the COVID-19 pandemic and some were for minor things like hoarding soap. However, Encalade

17

had over 40 disciplinaries for refusing to comply with orders, refusing to comply with housing, and refusing to work, all before the COVID-19 pandemic.

Dr. Turner also discussed a "fairly recent" letter written by Encalade in the last two years to prison administration about a nurse at one of the institutions. In the letter, he indicated that he wanted to marry the nurse, and asked the hospital to handle paperwork to allow him to marry the nurse and give his inheritance to her. He also mentioned wanting to have babies with the nurse. There was indication in the records that the nurse viewed this as an "unwanted communication." Dr. Turner testified that this letter was "concerning" because "it's sexual; it's inappropriate; and based on his history, we know that there's at least some chance of him making an effort to act on it because he's been willing to in the past." On cross-examination Dr. Turner admitted that Encalade did not proposition the nurse in any way in the letter or mention her body, only that he would like to marry her and have children. However, Dr. Turner felt that, in context, this letter was evidence of "inappropriate sexual behavior by a person that is a repeat violent sexual predator that is recent in time, and that is concerning that he would act out on those feelings[.]"

Dr. Turner testified that Encalade has not received any sex offender treatment while in prison. Encalade requested and started the treatment, but later quit. Encalade received disciplinary infractions for not participating in the sex offender treatment offered to him. Dr. Turner testified that if a sex offender completes treatment and is

18

found to have done well and made good efforts, that can be a protective factor that lowers the risk of reoffending. However, because Encalade started treatment and then quit, it is considered "treatment failure and is actually a risk factor." Dr. Turner also found the fact that Encalade believes that he does not need sex offender treatment and that it is safe for him to be around children to be concerning as it shows a lack of insight and understanding of his "own risk picture."

Dr. Turner also testified that Encalade has a preoccupation with sex. Encalade has admitted to being with prostitutes and to having over 100 sexual partners "while out in the free world," which Dr. Turner found "significant," especially considering the amount of time Encalade has spent incarcerated.

Dr. Turner also testified that Encalade had reported substance and alcohol abuse habits, which he considered to be additional risk factors. Dr. Turner testified that throughout the records he reviewed, he saw the presence of marijuana abuse. Encalade had "chronic multiple marijuana cigarettes a day over the years." In addition, he reported daily alcohol abuse or intoxication over the years; he began huffing paint fumes; when Encalade was a child, he began using crack cocaine and selling drugs. Dr. Turner acknowledged that at least in one place in the record, Encalade admitted to huffing and using marijuana as young as 10, but in other places in the records, it says 14 or 17. Dr. Turner acknowledged that these inconsistencies came from Encalade's own statements contained in various records. Dr. Turner

19

diagnosed Encalade with alcohol abuse disorder, severe, and cannabis use disorder, severe, but both in full remission as there is no evidence that he has used alcohol or marijuana since he was arrested and incarcerated in 1997. There was evidence that while on parole or probation, Encalade continued to use substances, and that Encalade was arrested at least five times for possession of marijuana. Dr. Turner testified that substance abuse is a risk factor for sexual reoffending.

Dr. Turner explained that the research indicates that when a sex offender conducts their sex offenses while under the influence of drugs, they are more likely to be reconvicted for additional sex offenses. Additionally, Dr. Turner testified that if the substance abuse is bad enough that it is impacting the offender's life and causing return trips to prison, that speaks to the offender's degree of antisociality. He further testified that Encalade's admission that he does not believe he needs substance abuse treatment in the future is concerning because, in the past, there was at least some correlation between his substance abuse and sexual offending. "[T]o return to free society without any intent or even seeing, having enough insight in himself to recognize that that's a problem and a need for treatment, is concerning."

### 6. Protective Factors

Dr. Turner testified that there were some positive or protective factors in Encalade's favor. A protective factor is something that decreases or lowers the offender's risk, or it can leave it where it was without increasing the risk.

Dr. Turner testified that one factor that did not lower, but did not increase, Encalade's risk factor was that he did not have any male victims. Research indicates that offenders with male victims are more likely to reoffend.

Dr. Turner testified that Encalade's age—over 60—lowers his risk. According to the research, after 60 there is a decline in acting out sexually violently. He also testified that Encalade has received his GED, as well as some on-the-job training and certificates in welding and horticulture while incarcerated. Dr. Turner noted that although Encalade had received several disciplinary infractions and was involved in the recent "staff member concern," "he has made some effort, also, to engage in self-help." Dr. Turner further testified that Encalade had formulated a "basic" release plan, indicating he understood that he will have to go to a halfway house upon release and find a job.

Dr. Turner opined that, based on his review of all of the risk factors, Encalade's risk level is "quite high," that there is evidence of a congenital or acquired condition that has affected his emotional or volitional capacity, that this condition has predisposed Encalade to commit predatory acts of sexual violence, that there is evidence that Encalade is a menace to the health and safety of others, and that there is evidence that Encalade is likely to engage in predatory acts of sexual violence. Based on Dr. Turner's education, training, experience, and evaluation of Encalade's records, he therefore concluded, based on a reasonable degree of

scientific certainty, that Encalade suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence.

**B.     Encalade**

The State called Encalade to testify on the second day of trial. Outside the presence of the jury, the trial court asked Encalade whether he intended to answer the questions that would be posed to him, to which Encalade responded no. The trial court admonished Encalade that they had "been down this road before" in that he refused to participate in discovery as ordered by the court and expert evaluations required by statute, and that if Encalade refused to answer questions, he could be subject to contempt proceedings, including jail time and fines.

After the jury returned, the State called Encalade to the stand. Encalade testified that he had refused to participate in court-ordered depositions and evaluations. In response to the State's remaining questions, Encalade "plead[ed] the Fifth."

Following the conclusion of evidence, the jury retired for deliberations. The jury charge included definitions for "behavioral abnormality," "predatory act," and "sexually violent predator," and these definitions tracked the statutory language defining these terms. *See* TEX. HEALTH & SAFETY CODE §§ 841.002(2), (5); 841.003(b). The sole jury question was: "Do you find beyond a reasonable doubt

that Lonnie Clemont Encalade is a sexually violent predator?" The jury answered "yes" to this question.

The trial court signed a final judgment and an order civilly committing Encalade upon his release from the TDCJ. Encalade filed a motion for new trial that was overruled by operation of law. This appeal followed.

**The SVP Act**

In 1999, the Texas Legislature enacted the SVP Act to protect the public from a "small but extremely dangerous group of sexually violent predators" who "have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE § 841.001. The Act provides for the involuntary civil commitment, by means of outpatient treatment and supervision, of a repeat sexual offender who is found to be a sexually violent predator. *Id.* §§ 841.003(a), 841.081(a).

In a suit to commit a person as a sexually violent predator, the State must prove beyond a reasonable doubt that the person is (i) a "repeat sexually violent offender" and (ii) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* §§ 841.003(a), 841.062(a). A person is a repeat sexually violent offender if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the

offenses. *Id.* § 841.003(b); *see also id.* § 841.002(8) (defining sexually violent offense). A behavioral abnormality is a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A "predatory act" is an "act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

## Due Process

In his first issue, Encalade posits: "Does Texas adequately ensure that only those who 'have serious difficulty controlling their behavior' are committed, and, if not, can jury instructions facilitate compliance with Constitutional requirements?" Encalade contends that Texas is unique among states with sexual predator laws in that it has "no statutory or judicial mechanism that clearly indicates the level of risk that must be present in order to civilly commit someone, hence permitting the commitment of those who do not have serious difficulty controlling their behavior, in violation of" *Kansas v. Crane*, 534 U.S. 407, 413 (2002). He argues that the SVP Act "permits an interpretation that violates the Fifth and Fourteenth Amendments by depriving respondents of liberty without due process of law" because it does not include a "method to ensure that only those with serious difficulty controlling behavior—a small, non-ordinary group of recidivists—are committed." However,

24

"[a]side from the drastic remedy of declaring the SVP statute unconstitutional," Encalade asserts that courts can provide due process protection by "addressing 'serious difficulty controlling behavior' in the jury instructions." Encalade proposes four ways to ensure due process protection through jury instructions:

1. Adding language indicating that the level of predisposition or likelihood required is such that the person has "serious difficulty controlling behavior;"

2. Defining "likely" as "probable" and "predisposes" as "makes the person likely to,"

3. Clarifying that "menace" means one who is a dangerous threat that must be confined for public safety, or

4. Adding "unless confined to a secure facility" to the end of the definition of behavioral abnormality.

Without such instructions, according to Encalade, it is possible to find that a respondent has a behavioral abnormality on nothing more than evidence of his prior crimes.

## A.    Inadequate Briefing

"An appellate brief is meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case." *Schied v. Merritt*, No. 01-15-00466-CV, 2016 WL 3751619, at *2 (Tex. App.—Houston [1st Dist.] July 12, 2016, no pet.) (mem. op.) (internal quotations omitted). The Texas Rules of Appellate Procedure control the required contents and organization of an appellant's brief. *See* TEX. R. APP. P. 38.1. "Only when we are provided with proper briefing

25

may we discharge our responsibility to review the appeal and make a decision that disposes of the appeal one way or the other." *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.); *see also Roberts for Roberts v. City of Tex. City*, No. 01-21-00064-CV, 2021 WL 5702464, at *2 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, no pet.) (mem. op.) (appellate court may not "abandon[ ] its role as judge and assum[e] the role of advocate for a party").

Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Despite presenting 26 pages of argument on his first issue, Encalade fails to include a single citation to the record in these 26 pages. In addition, Encalade's brief does not include a "clear and concise argument" because he fails to identify the relief he sought on this issue before the trial court and the relief he seeks on appeal. *See id.* Although we determined, after conducting a review of the record below, that Encalade filed a combined "Motion to Dismiss or to Instruct the Jury in order to Comply with Due Process Requirements," in his 26-page argument on appeal, he never referred to his motion to dismiss or to his request for jury instructions (or identified what specific jury instructions were requested), and never demonstrated how these were presented to and ruled on by the trial court. Further, it is unclear from his argument on appeal whether he is asking this Court to declare the SVP Act, or portions thereof,

26

unconstitutional,[5] whether he is arguing that the trial court should have, but failed to, instruct the jury in some way, or some combination of these two arguments. Because Encalade has failed to include a single citation to the record in this first issue, and because we cannot reasonably discern the error alleged to have been committed by the trial court or the relief Encalade requests on appeal, we conclude that he has waived his first issue. *See* TEX. R. APP. P. 38.1; *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d 858, 861 (Tex. App.—Dallas 2012, no pet.) ("Failure to cite to relevant portions of the record waives appellate review."); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (holding appellate court may use its discretion to find issues waived due to inadequate briefing); *Craaybeek v. Craaybeek*, No. 02-20-00080-CV, 2021 WL 1803652, at *5 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.) (holding that appellant's brief failed to include record and case citations and legal analysis and that these "deficiencies prevent[ed] [the court] from discerning the issues Appellant intended to raise for [the court's] review or the relief he sought— much less the legal and factual support for his arguments"); *Canton-Carter v. Baylor*

---

[5] It is equally unclear whether a constitutional challenge, if in fact one is being raised, is a facial challenge or an as applied challenge. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014) ("A facial challenge claims that a statute, by its terms, always operates unconstitutionally. By contrast, an as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances." (citations omitted)).

*Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (advising that "[i]t would be inappropriate for [an appellate] court to speculate as to what appellant may have intended to raise as an error by the trial court on appeal" because doing so forces appellate court to "stray from [its] role as a neutral adjudicator and become an advocate for appellant").

## B.    Preservation

Even if not waived by failure to adequately brief the issue, Encalade did not preserve his first issue, and we may not review this argument on appeal. *See Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 604 (Tex. 2012) ("When a party fails to preserve error in the trial court or waives an argument on appeal, an appellate court may not consider the unpreserved or waived issue."); *see also* TEX. R. APP. P.33.1. Encalade's focus[6] in his first issue appears to be on the lack of jury instructions to ensure compliance with due process requirements.[7] As noted above,

---

[6]    Although Encalade includes some comparative analysis between Texas's SVP statutory scheme and several other states with similar statutes, he expressly states that "[a]side from the drastic remedy of declaring the SVP Statute unconstitutional, Due Process protection can be provided by addressing 'serious difficulty controlling behavior' in the jury instructions." He then proceeds to discuss the various jury instructions given in other states and some proposed jury instructions that could be given in Texas that would "ensure due process compliance."

[7]    We again note that Encalade does not present his argument in terms of error that occurred in the trial court below. Rather, he argues throughout this first issue about what "Texas courts" need to do regarding instructing juries and offers "solutions" about what juries "could be permitted to know."

the record indicates that Encalade filed a motion to dismiss, or in the alternative, requested that the trial court "instruct the jury in a manner that ensures that a civil commitment verdict will comply with due process constraints." Encalade also submitted three different complete proposed jury charges. The first contained proposed definitions for "likely" and "predisposes." The second contained a proposed definition for "menace." The third added "unless confined in a secure facility" to the end of the definition of "behavioral abnormality."

Although it appears from the record that the trial court heard argument on and denied the motion to dismiss, it does not appear that the trial court ever ruled on Encalade's requests for specific jury instructions. At trial, the State brought up Encalade's motion to dismiss and request for jury instructions, stating: "I know opposing counsel filed a motion to dismiss and then also instructions for the jury charge, which I know the jury charge, we can take up later; but the motion to dismiss was something that she had filed." The trial court said it would be more than happy to hear the motion, and Encalade's counsel proceeded to argue the basis for the "motion to dismiss." After hearing argument, the trial court stated: "I read your motion. I think it's very well argued and very articulate and it's probably something to take up on appeal, so I'm going to deny your motion at this time." There was no discussion of the jury charge arguments or definitions Encalade proposed.

At a later point in the trial, the parties and the trial court discussed the jury charge. The trial court noted that the "charge I've been given from both of y'all seems relatively the same." The parties then proceeded to discuss the issue of Encalade's refusal to participate and whether to include a nonparticipation instruction in the charge. The trial court then asked if there was "anything else y'all want in this charge? They're basically similar for the most part." The State responded that Encalade "actually filed four different charges," and the trial court stated it was looking at the proposed charged filed on February 11. At that time, Encalade requested that "the limiting instruction be reiterated" referring to Dr. Turner's opinions being based on the records and hearsay. The parties continued the discussion of this limiting instruction, and the State asked to go off the record to confirm that they were reviewing the correct charge. When they returned on the record, there was no further discussion of the charge and the State called Encalade to testify. After Encalade's brief testimony, the trial court stated: "Let's work on the charge, and we'll go from there." A short recess was taken, off the record. Back on the record after the State rested, the trial court denied Encalade's motion for directed verdict and then asked: "Do you have any problems — is the charge of the Court okay with everybody?" Encalade's counsel said, "[n]o objections."

Preservation requires a timely, specific objection. TEX. R. APP. P. 33.1(a)(1)(A). The complaining party must also obtain a ruling on the objection, or

absent a ruling, the complaining party must object to the trial court's refusal to rule. *Id.* 33.1(a)(2). To preserve charge error for review, a party "must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. An objection does not satisfy Rule 274 unless "the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the conclusion that [the] trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it." *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd). A party must "clearly designate the alleged error and specifically explain the basis of its complaint in its objection to the charge." *Id.* at 404–05; *see also C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 793 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("To be sufficiently specific, the party's objection must identify the claimed error and explain the basis of the party's complaint."). If a party fails to lodge an objection to the jury charge that timely and plainly makes the trial court aware of the complaint, error is not preserved, and the complaint is waived. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007).

Here, although Encalade submitted various definitions in three different proposed jury charges, the requested definitions were included across three complete

31

charges and were obscured by additional instructions and definitions. *See In re Commitment of Miller*, 262 S.W.3d 877, 892 (Tex. App.—Beaumont 2008, pet. denied) ("While Rule 273 of the Texas Rules of Civil Procedure does not prohibit including the request in a complete charge, the request must not be obscured."); *see also* TEX. R. CIV. P. 274 ("When the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, such objection or request shall be untenable."). And although Encalade received a ruling on his motion to dismiss, he had requested these jury instructions in the alternative, but never brought the proposed definitions to the trial court's attention at the charge conference and did not object to their absence from the charge. Instead, the proposed definitions remained obscured in the charge and were never discussed with the trial court. *See Miller*, 262 S.W.3d at 892 (appellant's argument related to proposed definition of "sexually motivated conduct" was not preserved because definition was obscured in complete charge by other questions, definitions, and instructions, and appellant did not discuss requested definition with trial court at charge conference). Consequently, even if adequately briefed, we hold that Encalade did not preserve his jury instruction argument.

We overrule Encalade's first issue.

## Sufficiency of the Evidence

In his fourth and fifth issues, Encalade argues that the evidence is legally and factually insufficient to support his civil commitment.

### A.  Standard of Review

A commitment proceeding under the SVP Act is a civil proceeding that incorporates the standard of proof "beyond a reasonable doubt" typically reserved for criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 668, 674 (Tex. 2020) (explaining that proceeding under SVP Act is "rare civil case in which the burden of proof is beyond a reasonable doubt"). Thus, in reviewing verdicts in SVP cases for legal sufficiency of the evidence, we use the appellate standard of review applied in criminal cases. *Id.* at 675; *see also In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

Under the legal-sufficiency standard in criminal cases, we assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP Act. *Stoddard*, 619 S.W.3d at 675; *see also Stuteville*, 463 S.W.3d at 551. "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *Stuteville*, 463 S.W.3d at 551; *see Mullens*, 92 S.W.3d 881, 887 (Tex. App.— Beaumont 2002, pet. denied) (stating fact finder may resolve conflicts and

contradictions in evidence "by believing all, part, or none of the witnesses' testimony").

The Texas Supreme Court recently clarified the standard of review for factual sufficiency challenges in SVP cases, holding that in evaluating factual-sufficiency challenges to the evidence in sexually violent predator cases, an appellate court must "determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is [a sexually violent predator]." *Stoddard*, 619 S.W.3d at 668. In doing so, the Court explained:

> [T]he appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict.

*Id.*

## B. Legal Sufficiency

Encalade argues that the evidence is legally insufficient to support the jury's finding that he is a sexually violent predator because Dr. Turner's testimony was conclusory and speculative such that no rational factfinder could have found, beyond a reasonable doubt, the elements required under the SVP statute. He contends that Dr. Turner was unable to support many of his key conclusions with data from the records. "When a scientific opinion is admitted in evidence without objection, it may

34

be considered probative evidence even if the basis for the opinion is unreliable." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009); *see also In re Commitment of Manuel*, No. 01-18-00650-CV, 2019 WL 2458986, at *4 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.). A verdict, however, cannot be sustained on a mere ipse dixit of a credentialed witness. *Pollock*, 284 S.W.3d at 818; *Manuel*, 2019 WL 2458986, at *4. "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Pollock*, 284 S.W.3d at 818; *Manuel*, 2019 WL 2458986, at *4. Thus, we review the evidence at trial to determine whether Dr. Turner offered a basis for his opinion that Encalade is a repeat sexually violent offender and suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE § 841.003(a).

Dr. Turner, a clinical psychologist, testified at length about the methodology he used to determine whether Encalade suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. He testified that he reviewed numerous records about Encalade, including "[r]ecords related to [his] offenses, court documents, police investigation documents, records that relate to how he's gotten along in prison, what his behavior has been like in prison, any interviews he might have done for parole or with other psychologists, medical

35

records, things of that nature related to his criminal history, and then also social history." Dr. Turner tried to meet with Encalade on several occasions, including once before he was hired by the State. Dr. Turner testified that although Encalade was required to participate in the evaluations, Encalade refused to meet with him. As a result, Dr. Turner based his assessment on the historical records he received related to Encalade.

Dr. Turner found Encalade to be sexually deviant and antisocial, the two biggest factors for reoffending. Dr. Turner recognized that Encalade's case was "somewhat different than most of the behavioral abnormality cases" in that "in a lot of cases, if there are all adult victims and it's a serial rapist, we may see evidence of sadism" or "[i]f the victims are all . . . children, and we would look at pedophilia as a sexual deviance." Dr. Turner explained that the victims here were 14 and 12, so Encalade did not fit the definition of pedophilia, but still believed Encalade to be sexually deviant because he "is so antisocial that he takes sex when he wants it, when the opportunity presents itself, with no []regard for the victim in any capacity."

Encalade argues that Dr. Turner's opinion is conclusory because he was unable to point to anywhere in the record where there was evidence that Encalade had been using drugs by age ten, other than the MHMR report where the evaluator noted Encalade was malingering. However, Dr. Turner testified that there were multiple places in the record that indicated Encalade started acting out and using

drugs as early as 10 but agreed that one place it could have come from was the MHMR report. Dr. Turner stated multiple times that he found references Encalade "huffing paint fumes, as well as marijuana and alcohol," being expelled from school for repeated truancy, in trouble for shoplifting, and riding trains in multiple places in the record. As for whether it came from the MHMR report, Dr. Turner testified "I don't think that's the only place in the records where that information is; but it may certainly be there." And although Encalade's counsel asked Dr. Turner to look through the records on a break to confirm where he found that information, his counsel never recalled Dr. Turner or returned to this line of questioning.

Encalade also argues that Dr. Turner's opinion was conclusory because he could not point to any reason other than fear of COVID-19 as a reason for Encalade's refusal to participate in sex offender treatment. But Dr. Turner testified that Encalade refused treatment for a variety of reasons, including that he slept in or that he did not feel well, in addition to his fear of possible exposure to COVID-19. Dr. Turner stated that it would not surprise him if Encalade gave his fear of COVID-19 as one of the reasons for refusing treatment, but there were other reasons offered as well. Therefore, we disagree that there is no basis in the record for Dr. Turner's testimony related to Encalade's treatment failure.

But even setting aside the treatment failure as an increased risk factor, Dr. Turner identified a number of other factors he considered in assessing Encalade for

37

a behavioral abnormality and why each factor was important, including that Encalade was intoxicated during the commission of at least some of his offenses, that he has substance and alcohol abuse disorders, that he offended while on probation or parole, that he engaged in significant nonsexual criminal behavior, that he had received over 61 disciplinary infractions since being incarcerated, and that he has a preoccupation with sex, having claimed to have had over 100 sexual partners in the short time that he was not incarcerated. These other factors all contributed to Dr. Turner's opinion that Encalade suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence.

Finally, Encalade argues that Dr. Turner's testimony lacked statistical support because he did not consult the statistical tables that come with the Static-99 because he found them misleading. But Dr. Turner explained that the Static-99 provides a "very small piece of information," and that there are "very numerous factors that you have to look and assess that aren't addressed by the Static" and that he arrived at his opinion by balancing all those factors, not just the information considered by the Static-99 test.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Encalade suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, and therefore, the evidence is legally sufficient to support the jury's verdict.

## C.     Factual Sufficiency

We likewise conclude that the evidence is factually sufficient to support the jury's verdict that Encalade suffers from a behavioral abnormality. The evidentiary standard of review for factual sufficiency differs from the evaluation for legal sufficiency in SVP cases. As in a legal sufficiency analysis, the assumption remains that the finder of fact resolved disputed evidence in favor of its finding if a reasonable finder of fact could do so. *See Stoddard*, 619 S.W.3d at 674. However, in a factual sufficiency analysis, disputed evidence that a reasonable finder of fact could not have credited in favor of the finding is treated differently. *Id.* at 676. Under this analysis, we must determine whether, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts that do not support and are contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were satisfied. *Id.* at 678. A reviewing court's "mere disagreement" with the factfinder's verdict "as to [the] proper evidentiary weight and credibility cannot be the basis of a reversal on factual-sufficiency grounds." *Id.* at 677.

Here, Encalade argues that there are disputed facts that the jury could not have credited in favor of its ultimate finding that he is a sexually violent predator, including the extent to which Encalade's behavior is affected by his untreated

cancer, that Encalade did not complete treatment because of his fear of COVID-19, and the disputed sexual nature of Encalade's letter to prison administration. We disagree. Although Encalade takes issue with some of the testimony of Dr. Turner, the whole of the evidence supports the jury's finding. The "disputed" facts Encalade identifies do not undermine Dr. Turner's ultimate opinion that Encalade suffers from a behavioral abnormality. To the extent there are conflicts or inconsistencies in the evidence, it was within the province of the jury to weigh the evidence, judge the credibility of the witnesses, and resolve conflicts in the evidence. *Id.* at 668; *see also In re Commitment of Williams*, 539 S.W.3d 429, 440–41 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). The jury was free to believe all, part, or none of a witness's testimony. *Mullens*, 92 S.W.3d at 887.

Additionally, although the State concedes that the protective factors Dr. Turner testified to, including Encalade's advanced age, no male victims, his efforts to engage in self-help while incarcerated, and his basic release plan, are undisputed facts that are contrary to the jury's verdict, these undisputed facts are not so significant that the jury could not have found beyond a reasonable doubt that Encalade suffers from a behavioral abnormality. *See Stoddard*, 619 S.W.3d at 678.

We therefore hold there is legally and factually sufficient evidence to support the jury's finding that Encalade is a repeat sexually violent offender who suffers

40

from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* TEX. HEALTH & SAFETY CODE § 841.003(a).

We overrule Encalade's fourth and fifth issues.

## Exclusion of Evidence under Rule 705

In his second issue, Encalade argues that the trial court abused its discretion by sustaining the State's objection to the disclosure of a letter written by Encalade under Texas Rule of Evidence 705. The State argues that Encalade did not preserve his objection based on Rule 705 and, even if the objection was preserved, the trial court did not abuse its discretion.[8]

### A.      Standard of Review

We review evidentiary rulings using an abuse-of-discretion standard. *See Stuteville*, 463 S.W.3d at 554 (citing *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000)). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

---

[8]      The State contends that Encalade's objection to the trial court's rulings regarding the letter are waived because he did not make the same objection he makes on appeal, i.e., that the trial court erred in failing to require Dr. Turner to read the contents of the letter to the jury under Rule 705. We disagree. As seen from the exchange below, the basis for Encalade's counsel's objection was that the jury was not "able to hear what's in here that he's making his decision on." This is in line with the Rule 705 argument he makes on appeal—i.e., that disclosure of the letter as the basis for Dr. Turner's opinion was required under Rule 705.

41

**B.      Analysis**

Rule 705 of the Texas Rules of Evidence provides that an expert may disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data supporting his or her opinion through trial testimony. *See* TEX. R. EVID. 705(a) ("Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination."); *In re Commitment of Polk*, 187 S.W.3d 550, 555 (Tex. App.— Beaumont 2006, no pet.).

During Dr. Turner's direct examination, he testified that a recent letter written by Encalade was evidence that he had been "unable to pick up on cues from other individuals":

> STATE:          Did you see any evidence within the records that he recently has been unable to pick up on cues from other individuals?
>
> DR. TURNER:    Yes, ma'am.
>
> STATE:          Okay. And specifically regarding the nurse, what did you see within the records regarding that?
>
> DR. TURNER:    That he wrote a letter to the prison administration indicating that he intended to marry a nurse staff member at one of the institutions where he was housed and he wanted -- he was writing to ask the administration to handle paperwork that would allow for him to marry her and give his inheritance to her.

STATE:          And did he ever mention wanting to have babies with her?

DR. TURNER:     Yes, ma'am.

STATE:          And was that within the letter that he had written?

DR. TURNER:     Yes, ma'am.

STATE:          Okay. And how recent was that letter? Do you recall?

DR. TURNER:     It was fairly recent. I would say within the past two years.

STATE:          Okay.

DR. TURNER:     I can't remember the date, I'm sorry.

STATE:          And was there any notation within the records that that was unwanted communication from him?

DR. TURNER:     Yes, ma'am.

STATE:          And is that concerning to you, that he's writing these kind[s] of letters or has this belief in a relationship with someone who treated him medically?

DR. TURNER:     Yes.

STATE:          And what is that concern?

DR. TURNER:     Well, it's sexual; it's inappropriate; and based on his history, we know that there's at least some chance of him making an effort to act on it because he's been willing to in the past. So that is concerning.

On cross examination, Encalade questioned Dr. Turner about his opinion that the letter was "sexual," during which the following exchange occurred.

43

DEFENSE COUNSEL: About that letter, does he proposition the nurse sexually in any way? Does he mention her body?

DR. TURNER: No, ma'am, just that he would like to marry her.

DEFENSE COUNSEL: Okay.

DR. TURNER: And have children.

DEFENSE COUNSEL: Is it uncommon for patients, very ill people, to develop feelings for the caregivers that help them through a dark time in their life?

DR. TURNER: In general, no, ma'am.

DEFENSE COUNSEL: And does expressing the desire to marry someone necessarily translate to recent evidence of a sexual deviancy?

DR. TURNER: In this case, because of the context, I do --

DEFENSE COUNSEL: Okay. Do you have a copy of that letter with you?

DR. TURNER: I do, yes, ma'am. . . .

. . . . .

DEFENSE COUNSEL: Okay. Aside from the fact that he fantasizes about having -- perhaps fantasizes about having this land and leaving a legacy, what part of this is sexually deviant? Can you just point me to, I guess, first, the page and then kind of which section -- the top, bottom, middle?

DR. TURNER: Well, really, ma'am, it's just the letter in and of itself. I mean, it's a letter to administration expressing romantic feelings for a staff member and asking the administration to take care of certain legal matters that will ensure

44

that this staff member will receive his inheritance. I mean, that's --

DEFENSE COUNSEL: And is that --

DR. TURNER: -- just odd and –

DEFENSE COUNSEL: -- evidence --

THE COURT: You can't talk over each other.

DFENSE COUNSEL: And that's evidence of sexual deviance, of wanting to -- what was your terminology for sexual deviance? Have sexual relations with someone who's unwilling or it's abnormal?

. . . . .

DEFENSE COUNSEL: So wanting to marry her and leave her land, you think that is victimizing? Is that what you're trying to say, that that's recent evidence of him wanting to victimize somebody because he wants to marry her and leave the nurse that took care of him, leave her land?

DR. TURNER: My testimony is that it is inappropriate sexual behavior by a person that is a repeat violent sexual predator that is recent in time, and that is concerning that he would act out on those feelings in the way that he did.

DEFENSE COUNSEL: Okay. So there's no -- is there a particular part of the letter, or is it the whole letter?

STATE: Objection, your answer -- Your Honor – I'm sorry -- this has been asked and answered multiple times.

DEFENSE COUNSEL: In that case --

THE COURT: Objection is overruled. I don't think he's -- I think that she's asked the question. I just

45

DEFENSE COUNSEL:     don't think he's answered the question. I think you're right in part at least in the asked part, but I don't believe it's been answered. You may continue, ma'am.

DEFENSE COUNSEL:     I was just asking which part because I really don't want to ask you to read the whole thing because it is three pages; but, I mean, if you insist that it's the whole letter, would you mind reading your copy?

DR. TURNER:     My answer was the letter in its entirety.

DEFENSE COUNSEL:     Okay. Would you mind reading the letter in its entirety, then?

STATE:     Your Honor, this --

THE COURT:     Sustained.

STATE:     -- hasn't been entered.

THE COURT:     That's sustained.

DEFENSE COUNSEL:     Your Honor, I'd like to put the letter into evidence. That's permitted.

STATE:     Your Honor, this is not a writing by Dr. Turner; so he is not able to prove up this letter.

THE COURT:     I tend -- well, if you have an objection, it's sustained at this point.

STATE:     Yes. That's the objection,

Your Honor.

DEFENSE COUNSEL:     Well, Your Honor, I would object to the jury not being able to hear what's in here that he's making his decision on. If you won't read it out loud and --

THE COURT: First of all, I don't need your comments about my rulings. There is no predicate that's been laid. It is improper at this point. The State has objected, and I'm sustaining that objection. I said "at this point." If you want to attempt to establish it, that's fine; but at this point, sustained.

DEFENSE COUNSEL: We can move on.

Encalade argues that the trial court abused its discretion by not requiring Dr. Turner to read the entire contents of the letter into evidence, based on Rule 705. However, as Encalade concedes, Rule 705 allows for the disclosure of the facts and basis for an expert's opinion, but not necessarily the admission of that evidence. The case cited by Encalade in support of this issue on appeal makes this clear. *See Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 603 (Tex. App.—Fort Worth 1995, writ denied). There, the appellant argued that certain plat maps were admissible as the "underlying facts or data" from which the opposing party's expert formulated his opinions. *Id.* The court noted that under Rule 705, the trial court is "required" to allow disclosure of evidence to discredit an expert on cross-examination. *Id.* The court noted, however, that "[t]here is a distinct but important difference between disclosure, in which there is no discretion, and admission into evidence, where the trial court enjoys discretion." *Id.* Thus, the court held that the trial court did not abuse his discretion in disallowing the *admission* of the proffered evidence for purposes of cross-examination. *Id.* Because the trial court allowed

disclosure of the existence of the plat maps and did not prohibit cross-examination about the maps, the trial court did not abuse its discretion in excluding the plat maps from being admitted into evidence. *Id.*

Here, as can be seen from the exchange above, the disclosure of the existence of the letter, and its contents, was made to the jury. Dr. Turner was cross-examined extensively by Encalade about the letter and its contents. Dr. Turner testified about the contents of the letter multiple times, explaining that it was a letter to the prison administration indicating that he intended to marry a nurse staff member, asking the administration to handle paperwork that would allow for him to marry her and give his inheritance to her. He explained that the letter expressed romantic feelings for the nurse, and a desire to marry her, have babies with her, and that he wanted to leave his inheritance to her. Dr. Turner admitted there were no sexual propositions in the letter and that Encalade did not reference the nurse's body in any way. However, he explained that in his opinion, it was inappropriate sexual behavior by a person that is a repeat violent sexual predator that is recent in time, and that is concerning that he would act out on those feelings in the way that he did. Under the circumstances, Encalade was permitted the opportunity to fully cross-examine Dr. Turner about the letter and its contents and we decline to conclude that the trial court abused its discretion by refusing to admit the letter into evidence or require Dr. Turner to read the letter into evidence. *See Boswell*, 910 S.W.2d at 603; *cf. Wheatfall*

48

*v. State*, 882 S.W.2d 829, 837 (Tex. Crim. App. 1994) (concluding that only if document has been properly admitted into evidence may the contents be read aloud in front of jury); *Juarez v. State*, No. 04-15-00413-CR, 2016 WL 1359372, at \*4 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (mem. op.) (same).

Moreover, even if there was error in excluding this evidence, we hold that any error was harmless. There was sufficient evidence in the record that would support the jury's verdict that Encalade was a sexually violent predator, as detailed above. To make a successful challenge to evidentiary rulings, the complaining party must show that the judgment turns on the particular piece of evidence excluded or admitted. *See In re Commitment of Slama*, No. 09-13-00497-CV, 2014 WL 6488943, at \*5 (Tex. App.—Beaumont Nov. 20, 2014, no pet.) (mem. op.) ("Given the evidence in the record, the admissions from Slama, his prior convictions, and the testimony from Dr. Self that Slama suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence, Slama has not demonstrated that the trial court's judgment turns on the particular evidence about which he complains on appeal, and Slama has failed to demonstrate that the admission of the testimony probably caused the rendition of an improper judgment."). There was ample evidence from Dr. Turner's testimony, even setting aside any evidence based on the letter, to support his opinion that Encalade is a repeat sexually violent offender who suffers from a behavioral abnormality that makes him

likely to engage in a predatory act of sexual violence, including evidence related to his past sexual crimes, his other nonsexual criminal history, his antisocial personality, his numerous disciplinary infractions since being incarcerated, evidence that he was intoxicated during the commission of at least some of his offenses, that he has substance and alcohol abuse disorders, that he offended while on probation or parole, and that he has a preoccupation with sex, having claimed to have had over 100 sexual partners in the short time where he was not incarcerated.

We overrule Encalade's second issue.

## Exclusion of Expert Testimony

In his third issue, Encalade argues that the trial court erred by prohibiting Encalade's expert from testifying at trial as a sanction for his failure to comply with discovery orders and to participate in depositions and expert evaluations required by statute. According to Encalade, the sanctions imposed were not authorized by Section 841.061(f) of the Health and Safety Code because his designated expert did not interview him but based her opinion only on a review of the records. He likewise argues that the sanctions were also not authorized by Rule 215.2 of the Texas Rules of Civil Procedure because they were too extreme.

## A.     Standard of Review and Applicable Law

We review a trial court's ruling to impose sanctions for an abuse of discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *Cire v.*

*Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). The trial court's ruling will be reversed only if the trial court acted without reference to any guiding rules or principles, such that its ruling was arbitrary or unreasonable. *Cire*, 134 S.W.3d at 838–39. To determine if the sanctions were just, there must be a direct relationship between the improper conduct and the sanction the trial court imposed. *Id.* at 839 (citing *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)). "This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party." *Powell*, 811 S.W.2d at 917.

Section 841.061(f) of the Health and Safety Code authorizes certain sanctions when a person who is on trial to determine the person's status as a sexually violent predator fails to submit to a clinical interview on the State's behalf as required by the SVP Act:

> (f) A person who is on trial to determine the person's status as a sexually violent predator is required to submit to all expert clinical interviews that are required or permitted of the state to prepare for the person's trial. A person who fails to submit to a clinical interview on the state's behalf as required by this subsection is subject to the following consequences:
>
> > (1) the person's failure to participate may be used as evidence against the person at trial;
> >
> > (2) the person may be prohibited from offering into evidence the results of a clinical interview performed on the person's behalf; and

(3) the person may be subject to contempt proceedings if the person violates a court order by failing to submit to a clinical interview on the state's behalf.

TEX. HEALTH & SAFETY CODE § 841.061(f).

Texas Rule of Civil Procedure 215.2 governs the sanctions permitted for discovery abuse in civil proceedings, including authorizing the trial court to strike pleadings and to refuse to allow the disobedient party to support or oppose his claims or defenses. *See* TEX. R. CIV. P. 215.2(b).

## B. Analysis

Encalade first argues that the sanctions imposed by the trial court were not authorized under Section 841.061(f) because that only prohibits the offender from offering into evidence the results of a clinical interview preformed on his behalf, which did not occur here. Even if that were true, an issue we do not decide, the record before us supports the trial court's imposition of sanctions under Texas Rule of Civil Procedure 215.2.

In a factually similar case, the Beaumont Court of Appeals considered whether the striking of the offender's pleadings was a proper sanction. *See In re Commitment of Malone*, 336 S.W.3d 860, 861–62 (Tex. App.—Beaumont 2011, pet. denied). The trial court rejected the appellant's arguments, similar to those made by Encalade here, that the trial court was limited to the sanctions authorized by Section 841.061(f). In doing so, the court of appeals noted that the requirement that a person

52

submit to an expert examination under Section 841.061(c) did not evidence a legislative intent to preclude the use of the discovery tools generally available to the parties under the Texas Rules of Civil Procedure. *Id.* at 862. Accordingly, the trial court did not abuse its discretion by imposing discovery sanctions authorized by Rule 215.2 to remedy the appellant's discovery abuse. *Id.*

We agree with this analysis. The trial court here explained that sanctions were being imposed because, despite being "given multiple opportunities," Encalade "has steadfastly refused to submit to expert examinations *and to participate in discovery as ordered by this court.*" Therefore, the sanctions imposed were not only due to Encalade's failure to submit to an expert examination, but also due to his repeated failure to participate in discovery, which may be addressed through sanctions authorized by Rule 215.2. *See Malone*, 336 S.W.3d at 861–62.

We also reject Encalade's argument that the sanctions imposed were excessive and that the trial court did not consider lesser sanctions before excluding his expert's testimony. First, we note that although the State requested in its motion to strike that the trial court strike Encalade's pleadings and enter a judgment nihil dicit, the trial court did not impose those sanctions. Rather, the trial court excluded Encalade's expert but did not award a judgment by default. Instead, the jury determined that Encalade suffers from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence. Thus, while the sanctions imposed

53

were severe, the trial court did not remove from the jury the question of whether the State proved that Encalade was predisposed to commit a predatory act of sexual violence. *See id.* at 863 (noting that although sanction of striking pleadings was severe, trial court did not award judgment by default but rather submitted to jury question of whether appellant was predisposed to commit a predatory act of sexual violence).

As evidenced by the record, Encalade refused to participate in any discovery for over a year, beginning with his first refusal to submit to Dr. Turner's examination in December 2020. Thereafter, he was ordered by the trial court to participate in an expert evaluation conducted by Dr. Turner and to comply with "all discovery requests allowed under the law." Despite this court order and being admonished by the trial court of the consequences for his failure to participate, Encalade refused to participate in the expert evaluation.

Encalade also refused to participate in discovery, including sitting for his deposition. As evidenced by email communications between the State and Encalade's counsel, he refused to cooperate or communicate with his own counsel, which necessitated the rescheduling of his deposition at least once. After his deposition was rescheduled to July 19, 2021, he indicated to TDCJ staff that he refused to participate, and therefore, the State canceled his deposition scheduled for that date. Encalade also refused to participate in his deposition that was noticed for

August 16. After this refusal, the State moved to compel his appearance, which the trial court granted on October 22. In this order, the trial court ordered Encalade "to participate in the discovery process, to include submitting himself for a deposition and responding to discovery requests made by the [State]." The trial court further warned Encalade that the failure "to answer a question at deposition as directed by this Court . . . may be considered a contempt of Court." On February 1, 2022, the State noticed Encalade's deposition for February 15. Encalade again failed to appear.

Accordingly, on February 24, 2022, the day before trial, the trial court entered an order for trial sanctions. In the order, the trial court noted that Encalade had "been given multiple opportunities, yet has steadfastly refused to submit to expert examinations and to participate in discovery as ordered by this court." Accordingly, the trial court imposed the following sanctions:

> A jury instruction will be given that states [Encalade's] refusal to submit to expert examinations may be used as evidence that [Encalade] has a behavioral abnormality that predisposes him to commit a predatory act of sexual violence. [Encalade] is prohibited from offering evidence [of] the results of an expert examination performed on [his] behalf at trial.

In light of Encalade's continued refusals to participate in discovery, including his refusal after being directed to participate in discovery in two orders by the trial court, the trial court had the discretion to impose a "just" sanction authorized by Rule 215.2(b). *See* TEX. R. CIV. P. 215.2(b). Rule 215.2(b) authorizes trial courts to prohibit a disobedient party from introducing designated matters into evidence. *See*

55

*id.* 215.2(b)(4). Since one of the issues in SVP cases concerns whether the person alleged by the State to be a sexual predator has a behavioral abnormality predisposing him to engage in a predatory act of sexual violence, the person's testimony is generally relevant to the central issues in dispute. Depriving the State of this information interferes with the State's ability to meet its burden. Given the relevance of the information that a deposition of a person on trial in a SVP case is likely to reveal, as well as the trial court's several attempts to gain Encalade's cooperation with pre-trial discovery, we conclude the trial court's remedy of excluding Encalade's expert was a just sanction. *See Malone*, 336 S.W.3d at 863.

Additionally, the trial court considered the imposition of lesser sanctions, including contempt, but considering Encalade's continued refusal to participate in any and all discovery, and his continued refusal to communicate with his own counsel, the record demonstrates that this is an exceptional case in which no lesser sanctions would promote compliance with the discovery rules, and the trial court was not required to test lesser sanctions. *See Cire*, 134 S.W.3d at 842 (in cases of "egregious conduct and blatant disregard for the discovery process," trial court is not required to test effectiveness of lesser sanctions before imposing death penalty sanctions).

We hold the trial court did not abuse its discretion in excluding Encalade's expert from testifying. We further conclude the trial court's order sanctioning Encalade was just and that the sanctions imposed by the order were not excessive.

We overrule Encalade's third issue.

## Conclusion

We affirm the trial court's order of commitment.

Amparo Guerra
Justice

Panel consists of Justices Landau, Countiss, and Guerra.